## White v. Cherry.

(Decided June 21, 1927.)

### Appeal from Warren Circuit Court.

1. Wills—Evidence in will contest relative to testamentary capacity of testator held sufficient to take case to jury on such question.

2. Wills.—In will contest, evidence on question of undue influence exercised held for jury.

3. Wills.—In action contesting a will wherein testator devised all property to niece without provision for half-sisters, admission of will by testator's mother, made 65 years previously, leaving testator in entire charge of devise therein to sisters, with express

power to make such settlement as he thought just and right, held prejudicial error, in that natural effect would be to create impression that testator was under moral obligation to provide for half-sisters in his will.

SIMS & HERDMAN and G. D. MILLIKEN for appellants.

RODES & HARLIN, CHAS. R. BELL and W. E. SETTLE for appellees.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Reversing.

J. W. Butt died unmarried, a resident of Warren county, in December, 1925, leaving a will by which he devised his entire estate to his niece, Ida B. White. The estate was of value about $50,000. He had two half-sisters, the daughters of his mother by a second marriage, Mrs. Maggie Cherry and Mrs. Mattie P. Gualtney. Mrs. Cherry had nine children. Mrs. Gualtney had two, Mrs. Ida B. White and Mrs. Maggie Holland. Mrs. Cherry filed this action contesting the will. On the trial of the case, the jury returned a verdict against the will. The contestees appeal.

It is earnestly insisted for the appellants that there was no evidence of mental incapacity or undue influence sufficient to take the case to the jury, and that on the evidence the court should have instructed the jury peremptorily to find for the will. The testator was 82 years old. He had lived most of his life on a farm six miles from Bowling Green where his mother had lived. He sold that farm and bought another near by. He sold his farm in 1919, and in December of that year moved to Bowling Green. For about a year he lived there with Mrs. Holland and her husband, Pleamon Holland. His niece, Mrs. White, and her mother had up to this time lived with him on the farm since the death of Mrs. White's husband in 1902. When he moved to Bowling Green, Mrs. White went to Louisville to live. Her mother lived with him at Holland's for about a year. He paid $1,000 on the purchase of Holland's house. In about a year Mrs. White returned from Louisville, and he then bought a house on Broadway and moved to it, living there with Mrs. White and her mother until his death. In the spring of 1923 he sent for Byron Renfrow, who had for many years been

his attorney, and had him to write his will, which was duly executed and placed in his box at the bank for safe-keeping. By this will he devised to each of his nieces a legacy, giving Mrs. White $2,000 more than any of the others, and devised the rest of his estate equally to his two half-sisters. He made S. M. Matlock the executor of the will. About eight months later he sent again for Renfrow and told him that he wanted to change his will; that Matlock had not treated him right, and he wanted to make Mrs. White the executor of the will. The will was then rewritten by Renfrow, making no change in it except to substitute Mrs. White for Matlock as executor. In the fall of 1923, he had a spell of sickness and lost the use of his left side; his tongue was affected and he talked with difficulty. But later he got better and went about again. In the fall of the next year he was sick again, but after this got out again. On February 6, 1925, he went to the office of T. W. Thomas, who had attended to some legal matters for him before, and there had the will in contest written, giving all the property to Ida B. White and making her the executrix without bond. Nobody was present at this time but Mr. Thomas and his stenographer. Up to his death he managed his property, which consisted of the lending of money and collecting interest. He was quite deaf, but was fond of talking and joking. Mr. Renfrow states that he was competent to make a will in 1923, when he wrote the first will, but that he did not think him competent to make a will when he wrote the second will, and that he only wrote it because it made no change in the first will, except to change the executor, and he did not think that very material. He had known him intimately for many years and says that at this time he did not think he was in a very good mental condition, and that he frequently would say, "I haven't got any sense," and that he had an unfounded impression that Matlock had defrauded him.

Pleamond Holland testified that he lived one square from the testator, and was at his house daily. He said in 1924 he had Bright's disease; that his feet were swollen, he would have crazy spells, he would miss his footing; that he would stick his fork around and put the fork to his mouth while eating, and there would be nothing on his fork; he would sit at the table and go to sleep; and that he was flighty at times. He took the testator to Ren-

frow's office when the first will was written, and that before they left the house Mrs. White said to him:

"That will will not stand; he is crazy half of the time and don't know what he is doing."

He also says she twice told him this afterward. He testified that during the last year of his life the testator was not capable of trading or of attending to any business at all, and did not know anything about what his estate was worth; that three of his cousins had been crazy; and that Mrs. White said she feared that he would, like them, lose his mind entirely. Put in narrative form, Holland made these statements as to the testator's condition:

"The early part of the winter of 1922 he had a kind of paralytic stroke, and it lasted him. He never got out as well as I remember until the 1st of April, 1923. He was practically paralyzed, all on one side, so he could not handle himself well at all. I fixed a way for him so he could get up and down when he wanted to. I fixed a rope in the ceiling to hang down by the bed by the side of him, and he could get hold of the rope and work himself out of the bed, and that is the way he got back. I would go every day to see after him and see if there was anything I could do for him. In the fall of 1924 his condition got pretty bad for a few days. He was there on the back porch, and he had a kind of crazy spell and couldn't talk so that you could understand, and he didn't have mind enough to know what he was doing; that got the women excited, and they sent for me and I went; he wanted me to hunt papers and search the drawers and things and when he would get them they would not be the right ones. We worried a good while with him and he got still and sleepy and went to sleep, and he was a little flighty then for several days, and it finally wore off of him. These spells would come back on him from time to time and last for several days at a time in the last two years of his life. If he just got still, he would be asleep; sometimes he would go sound asleep and you talking to him. His feet were swollen so that he had to wear slippers, and for six months there he couldn't get on a shoe. During the last year of his life he wasn't capable of trading or attending to business at all."

W. T. Hines was the vice president of the American National Bank; Mr. Matlock was the president. Mr. Hines would get out the testator's box for him when he came to the bank and would assist him in finding papers that he wanted. A number of times after 1923 he would come in and seem to stare off into empty space, and would go off in a sleep sometimes, and sometimes break out in a laugh; that he didn't have any conception of what he had in his box and had an unfounded notion that Mr. Matlock had not treated him right.

This testimony was confirmed by the testimony of several other witnesses, who knew the testator well, and from his acts and conversation testified that he did not have mind enough to know his property and his obligation to the objects of his bounty and to dispose of his property according to a fixed prupose of his own after his last sickness in the fall of 1924. This evidence, confirmed by his age and evident febleness, was sufficient to take the case to the jury on the question of capacity.

On the question of undue influence, Mrs. Cherry testified that her brother told her time and again that what he left would be divided between her and her sister; that they were old and poor, and he was going to leave it to them when he died. Before he made the first will he told her this:

> "I studied about it, and I felt like I ought to give the children something, and I have been thinking about getting Mr. Renfrow to write me a will."

He bought two state warrants, amounting to $2,500, from her in the summer of 1924, and in that conversation he told her that he was going to give his property to her and her sister, and she would get them back. She also testified this:

> "He said that the farm that belonged to his mother, if he sold it, that half of the money went to me and half to Prudie, and that he promised her on her dying bed not to sell it, but he had sold it and would divide the money between us, that we were old and poor."

Pleamon Holland testified that, when he took the testator to Mr. Renfrow to write the first will, he was standing at the door and heard Mrs. White say to him,

"Yes, you will," and he said, "No, I won't, I will be durned if I give it all to you," and he turned around to me and said, "Pleamon, you go and get your car," and she turned around and snapped her fingers at him and said, "I will get it anyhow by law," and he said, "I be durned if you have it all." He stated that before the second will was written Mrs. White was talking to him and did not want Matlock to have anything to do with the estate, saying that he had not given satisfaction in his business and was trying to beat the old man out of something. He also testified that the old man told him that Skyles Ewing had said to him that he ought to give all his property to Mrs. White for taking care of him and her mother. But he said that he had his will fixed like he wanted it except the one hundred acres of land, the old home place.

Mrs. Mayhugh testified that Mrs. White said to her after the first will was written that he had willed to his nieces certain amounts and had willed the remainder of the estate to his two sisters, and she then said he would have to make that will over or she would sue for $5 a day for taking care of him. She also testified that at times Mrs. White was very cross with her uncle, and that he would go out in the yard and stay back there.

Mrs. Moyer, a daughter of Mrs. Cherry, testified that when her brother was sick out in California, the summer of 1925, she went to see her uncle about letting him have some money; that they had some talk in the house; he then followed her out in the street, and out there he said this: "When I get my interest money, I am going to help this boy, but don't you let them in the house know anything about it, for I would never hear the last of it." She also testified that six weeks before he died, he said to her: "I want to talk to you." She asked him if he wanted her to send for him and he said: "No; I don't want none of them to come, I want to talk to you." She also testified, speaking of the two state warrants, that he on two occasions told her, "I never expect to spend this money and some day your mother will get it back;" he said to her that he had done lots for Aunt Prudie's family, and yet they quarreled and talked "like I owe them something, when I have raised them."

While it does not appear by the evidence that Mrs. White in fact, after 1923, ever said anything to her uncle

about the will, it does appear that he had a long cherished purpose to devise his estate to his two sisters, and that he had made a will to this effect in 1923; that Mrs. White was opposed to Mr. Matlock being the executor and was not satisfied with the devise which in that will he had made to her; and it appears that in the fall of 1923, the will was changed so as to substitute her for Matlock as executor, and then in February, 1925, a new will was written which left everything to her; during this time the testator was living with her and was in a feeble condition and to a large extent dependent upon her for daily care.

In view of the declarations of Mrs. White when he made the will of 1923, his long cherished purpose to provide for his sisters, his subsequent declarations, her opposition to Matlock being the executor, the changes made which she desired, by which his long cherished purpose was defeated after he became infirm and to a large extent dependent on her, it cannot be said that there is no evidence of undue influence, for it may be inferred that she continued to press on him the claim she then said she would insist on, and did so with more success after his infirmity increased. Ensminger v. Bailey, 203 Ky. 49, 261 S. W. 837; Palmer v. Smith, 211 Ky. 105, 276 S. W. 1055; Rounds v. Rounds, 214 Ky. 294, 283 S. W. 77.

"Mental incapacity and undue influence go hand in hand, for the want of capacity opens the door for the exercise of undue influence." Bradford v. Kinney, 216 Ky. 348, 287 S. W. 921.

The contestee, Mrs. White, in her testimony denied making each of the statements attributed to her by the proof of the contestant and showed that she and her uncle lived together very happily, much as father and daughter. She sustained her testimony by a number of other witnesses, and also proved by a number of witnesses that his mind was good all the time except during his spells of illness. She proved by the family physician that he was not paralyzed at any time; that the trouble with him was rheumatism; and that the condition of his tongue while he was sick was simply due to a bad condition of the stomach, and it passed away in a few days when the condition of the stomach was relieved. She also showed that he went to the lawyer's office alone and had the will written, and that she did not know the contents of the will until after his death.

Skiles Ewing testified that the testator took him by the arm and took him in the back of the bank and said, "By gollie, I have got to fix my will; I haven't fixed it right." Ewing said, "What is the matter with it?" and he said, "I have to protect Ida." This was about the 1st of February, 1925. On the following Sunday Butts joined the church. Ewing went to Florida, and on his return Butts took him in the back of the bank and said, "By granny, I have got it fixed; I have fixed my will." Ewing also testified that the testator was fully competent, just as he had always been, and that he did not mention the matter of the will to Butts at all.

The only evidence objected to on the trial was the will of testator's mother, Ruth Wheeler, made May 1, 1860, and it is earnestly insisted that for this a new trial should be granted. By this will the mother devised to her son, John W. Butts, her tract of land in Warren county; should he die before attaining 21 years of age then the land should go to his sisters, or the survivors of them. She also devised to him one equal fourth part of the slaves she owned. She then devised to him, as trustee for his three half-sisters, or the survivors of them, all the remainder of her estate, to be held and used by him as trustee until they were 21 years of age, or married, and then he was authorized at his own election to pay over to the one so attaining 21 years of age, or marrying, her share of the estate. If any of the daughters died without children, the surviving sisters should have her share. Butts, as trustee and as executor of the will, was released from giving any bond as executor or trustee, and it was provided that any settlement that he made as executor or as trustee should be binding on all persons, just as he might say was fair and right, and he was not to be held responsible to any court or other tribunal for his actings and doings under the will.

While this court has held in a number of cases that evidence may be admitted showing the situation of the parties so as to put the jury in the light of all the circumstances surrounding the testator, evidence of remote facts has been held incompetent. Thus in Wiggington v. Wiggington, 194 Ky. 385, 239 S. W. 455, where the will was contested by the children of the testator's first wife on the ground of undue influence, the contestants introduced proof that the testator had received $5,000 through

his first wife. The evidence was held incompetent, the court said:

"There is a decided tendency among jurors to consider the subject of testamentary capacity in the light of what they may deem a just disposition of the property, and while that is a proper element to be considered in certain cases, in connection with other relevant facts and circumstances, it cannot be injected into the case by the proving of facts that impose no obligation on the testator in disposing of his property. The natural effect of this testimony was to bring to the minds of the jury the erroneous belief that it was the testator's duty to dispose of his property, to the extent indicated, equally among his children, which duty in fact did not exist any more than it existed as to his other property. The testimony was, therefore, prejudicial."

The trusts created by his mother's will, made 65 years before he made his will, had presumptively been settled when his sisters became of age or married, or in a reasonable time thereafter. The third daughter died in infancy, unmarried. This paper showed no obligation on the testator in disposing of his property. The natural effect of it was to create in the minds of the jury the impression that as the testator was left in entire charge of what was devised to his sisters, and given the express power to make such settlement as he thought just and right, without supervision by any court or other tribunal, there was a moral obligation on his part to provide for his half-sisters in his will when he knew that they were old and poor. The will was therefore improperly admitted in evidence, and the court cannot escape the conclusion that its admission in evidence was prejudicial to the substantial rights of the contestees. For this paper would have great weight with the jury, and might have been used with great force in the argument of counsel before the jury. The weight of the evidence as to testamentary capacity was with the contestees. The evidence as to undue influence came in the main from persons who were more or less interested or might think they were interested in the breaking of the will. Under such circumstances, the will of the mother may have played an important part in the decision of the case by the jury. A majority verdict was rendered by the jury, and without the will of the mother the jury may have viewed the case

differently.  The court cannot hold the error not prejudicial when the evidence was such as may have had great weight with the jury.

Judgment reversed, and cause remanded for a new trial.

The whole court sitting.