# Douglas' Executor et al. v. Douglas et al.

(Decided June 20, 1930.)

M. H. McLEAN and S. D. ROUSE for appellants.

ROBERT C. SIMMONS for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Ralph J. Douglas, age 42 years and 6 months, died a resident of Kenton county, January 24, 1928.  He was survived by his father and mother, John and Mary Douglas, his brother, Charles Douglas, and his sister, Cora Metz, wife of Clifford Metz.  Mr. and Mrs. Metz had two children, Richard and Mary Alice, and Charles Douglas

had one son, Jack Douglas. On January 11, 1928, he signed and acknowledged in the presence of Blanche Anderson and M. H. McLean the following will:

"I, Ralph J. Douglas, being of sound and disposing mind and memory, do hereby make, publish and declare this my last will and testament, hereby revoking all prior wills heretofore made, and hereby bequeath and devise my estate as follows:

"Item 1. I desire that all my just debts and funeral expenses be paid out of the cash which I have on hand and the cash on deposit in the First National Bank of Carthage, Ohio; the Fourth Central Savings Bank of Cincinnati, Ohio, and the First National Bank of Covington, Kentucky. The balance of the cash on hand and on deposit, after the payment of my debts, and the payment of a bequest to Dr. C. N. Heisel of $1000.00 hereinafter provided for I bequeath to my beloved mother, Mary Douglas.

"Item 2. I bequeath to my father, John Douglas, the boat named 'Monte' and to my sister Cora D. Metz, the boat named 'Mary Alice.'

"Item 3. To my sister, Cora D. Metz, I bequeath the stock owned by me in the Coney Island, Incorporated, and also the stock owned by me in the Mackatewah Club.

"Item 4. I bequeath to my nephew, Richard Metz, my golf outfit and also one of my gold watches; to my nephew, Jack Douglas, I bequeath one of my gold watches.

"Item 5. I bequeath my brother-in-law, Clifford Metz, all of my guns, excepting the 'Sauer' gun which gun I hereby give and bequeath to Dr. C. N. Heisel.

"Item 6. I hereby bequeath to Dr. C. N. Heisel the sum of $1,000.00 to be paid out of the cash on hand or in the banks heretofore set out.

"Item 7. I hereby bequeath and give to Jessie Stewart my Cadillac car, all jewelry and personal belongings located in my residence at 1531 Madison Avenue, Covington, Kentucky, also shares of stock owned by me in the Central Savings Bank of Covington, Kentucky, and also all preferred and common stock owned by me in the Stewart Iron Works Company in Covington, Kentucky, and also all uncashed express checks or orders on hand.

"Item 8. I hereby bequeath to my beloved mother, Mary Douglas, and my father, John Douglas, jointly for and during their life the income from the stock of the John Douglas Company owned by me, and upon their death then I bequeath said stock to Jessie Stewart if she is still living and unmarried at said time; otherwise the said stock to go to my sister, Cora D. Metz.

"Item 9. I bequeath to my niece, Mary Alice Metz, the stock owned by me in the garage company in Cincinnati, Ohio.

"Item 10. All the rest and residue of my estate, real, personal or mixed wheresoever situate, I devise and bequeath to my beloved mother, Mary Douglas, my sister, Cora D. Metz and Jessie Stewart in equal parts.

"Item 11. I hereby nominate and appoint Richard C. Stewart, Executor of this my last will and testament and request that he be permitted to qualify and act without giving bond, and that no inventory or appraisal be made of my estate.

"In Testimony Whereof, I have hereunto subscribed my name this 11th day of January, 1928, in the presence of the subscribing witnesses."

After the probate, the testator's father and mother contested the will on the ground of mental incapacity and undue influence. The jury found against the will, and the executor and beneficiaries appeal.

The first ground urged for reversal is that the verdict was flagrantly against the evidence. The testator, who appears to have been a man of generous disposition and attractive personality, was a sportsman and a clubman. He loved the outdoors, was fond of hunting, fishing, boating, golf, and travel, and was supplied with boats, guns and other equipment necessary for the enjoyment of these diversions. His father had been engaged in the business of manufacturing plumbers' supplies under the name of John L. Douglas Company. Some time prior to his death the testator was superintendent of pottery at a salary of $18,000 a year. While it is true that he devoted some of his time to the business, there can be no doubt that he spent the greater portion of his time in the indulgence of his sporting proclivities. In 1916 the

testator married Elsa Stewart, a daughter of R. C. Stewart. While in California for his health she was stricken with appendicitis and died in the year 1922. After her death he continued to live with his father-in-law, who had the same tastes and made him welcome in the home. He, Mr. Stewart, and Miss Jessie traveled and spent much of their time together.

At the time of his death he was engaged to Miss Jessie. He then had $21,930.99 in the Central Trust and other banks, money orders and Liberty bonds to the amount of $2,575, a small amount of stock in several corporations of little value, $500 worth of the preferred, and $1,000 worth of the common, stock of the Stewart Company, two shares of stock in the Central Savings Bank of Covington, worth $200, other bank deposits amounting to about $2,500, which last items appear to have been transferred to him from the estate of his wife. He also had a motorcar, two motorboats, and certain personal effects. He was the owner of $10,000 worth of preferred stock of the John L. Douglas Company, and held 500 shares of the common stock under a contract by which the dividends were to be paid to his father, and, on his death, to his mother, so long as she lived, and he agreed not to dispose of, pledge, or assign the stock without the consent of his father, and not to use the voting power vested in him so as to hinder his father from having full control of the company. The tentative inventory produced at the trial showed an estate of $99,614.74, exclusive of a deposit of $1,180, which was discovered during the hearing of the case. In this inventory the common stock of the John L. Douglas Company was appraised at $50,000. It is admitted, however, that its actual value is several times that amount.

The following facts are not in dispute: When the testator was 5 years of age he had an attack of scarlet fever, which left him with a case of Bright's disease, and when 21 years of age his application for life insurance was rejected on account of that trouble. In the fall of 1921 he had an acute attack of Bright's disease on returning from a hunting trip, but the attack subsided in 3 or 4 months. In the summer of 1927 his health grew worse, and in the fall of that year his condition became serious. He was put to bed, a nurse was called, and in 2 or 3 weeks his condition improved so that

he was able to come down stairs Thanksgiving. After a while he continued to improve, and was out on the street in company with his nurse. After that it was found necessary to extract his teeth, and there followed a severe hemorrhage of the nose. About December 20th his limbs were swollen, and œdema of the brain was manifest. The room was darkened, and he was given morphine in doses of $\frac{1}{8}$ to $\frac{1}{4}$ of a grain. About December 28th two nurses were installed. About a week before his death on January 24, 1928, it was found difficult to control him, and a male nurse was engaged.

Briefly stated, the evidence for the contestants, in so far as it is pertinent and material, is as follows: After giving the history of Ralph's life his mother, Mary Douglas, testified that she saw Ralph nearly every day. About the first week in January his limbs were much swollen. During the occasion of her visits he talked irrationally, at random, and then did not talk at all. From the 1st of January he seemed to be in a stupor, very drowsy, and would sleep almost all the time. He used profane language in her presence, though he had never done so before. From that time on he never talked connectedly for any length of time. The day the will was written she arrived about 1:30 in the afternoon. She was received by Miss Stewart, conducted in the drawing room, and remained there possibly two hours. This was not the usual custom. Before that she had been detained only 15 or 20 minutes. She was in the room with the nurse, and Mr. Stewart remained with her most of the time. Miss Stewart told her that they expected Mr. McLean, and that they were going to have Ralph sign some papers from the factory. While there Mr. Metz came down and told her what had taken place. She then went up to see Ralph. Mr. Stewart was sitting in front of Ralph on a chair. Ralph said nothing while the nurse was there. After he went out, Ralph said he was going to die, and, when she protested, he replied, "Oh, yes, I am, because they had me make my will." . She asked him how he had made it, and he told her he had left the John Douglas Company stock to her. He then stated he was not able to talk any more—he was too sick. She remained with him about 20 minutes and left the room. Her son was restless the next day, and did not have much to say. He would doze off.

They would put a little table in front of him to keep him from falling over. She saw him after that. He did not talk connectedly, and slept most of the time. On one occasion when the men were working out in the street he thought his father was there. This was the day after the will was made. His condition continued to grow worse. Standing out on the porch 4 or 5 days before his death she heard him call "Fire." She first saw Mr. Metz about 4 o'clock on the afternoon the will was written. He told her Ralph had made a will and stated its contents. John Douglas, father of Ralph, testified that he came twice to see Ralph. On his first visit on December 24th, he found him very sick sitting in a chair and in a daze—would doze off, brace up, and look at you in a wild way. In the fall before Mr. Stewart had told him that he wanted Ralph to get married to Jessie.

Clifford Metz, vice president and general manager of the John L. Douglas Company, and the testator's brother-in-law, testified as follows: The day the will was made Mr. Stewart called him up about 9 or 10 o'clock in the morning and said that the doctor told Ralph the night before that he was not going to live, and suggested that he make his will. When he arrived, he found Mr. Stewart with Mr. McLean. Mr. Stewart said, "You go in and speak to him, he wants to see you." When he went in he found Ralph propped up in a chair with a table in front of him, sprawled over the table. Ralph would fall asleep, doze, and drop his head on the table. Ralph said he wanted the stock in the John L. Douglas Company to go to his mother. He then fell asleep. After that Ralph mentioned an automobile and some furnishings in the house that he wanted to go to Jessie. He gleaned that Ralph wanted to give back to his side of the family things he had received from his father, and to his wife's family the things he had received from that side of the house. He told Ralph he would go out and tell Mr. Stewart that was what he wanted. He found Mr. Stewart and Mr. McLean together. He told them what Ralph had said. Mr. Stewart laughed and pulled out a piece of paper and said, "Here is what Ralph wants." Mr. McLean suggested that he had better go in and see Ralph. After Mr. McLean's departure, Mr. Stewart suggested that they go in and see Ralph. Mr. Stewart took a chair and moved

it close to Ralph, and said, "Ralph, don't you want that stock to go to Jessie, the stock in the John L. Douglas Company." Ralph looked up and said, "No, no, I want that to go to my mother." Mr. Stewart said, "Well when your mother is gone don't you want Jessie to have it." Ralph said, "Is that all right, Cliff?" He told Ralph that anything he wanted was all right. At that time there were some men working in the street, and Ralph said his father was working out there. When Mr. McLean returned, Mr. Stewart wanted to see the will. Mr. McLean said he did not think it proper. Mr. Stewart suggested that he and Cliff go in and witness the will, but Mr. McLean said, "No." Ralph's condition was very apparent the 1st of January. He would start talking about something, and fall asleep. Sometimes he would become fairly enthused, start to talk, and then become drowsy, wake up, and talk about something else. Harold H. Peterman testified that Ralph would serve on a committee, agree to a recommendation, and, when the matter went before the board, he would object and take the opposite side. He noticed this during the latter part of 1926 and early part of 1927. William H. Corell testified that during the fall of 1927 Ralph would change his orders for sandwiches, milk, and coffee, and would say he had to go home, and then agree to play golf, and, when others who had invited him to play saw him playing, and asked what was the matter, he would say, "I don't know."

Mrs. Cora D. Metz, Ralph's sister, and one of the beneficiaries under the will, testified that the first four weeks she visited him Ralph was in bed most of the time. He appeared to be a little better at Thanksgiving time. After her mother came, and toward the end, his condition grew worse. At times he was irrational, was not able to sit up, and would fall on the table, which was placed in front of him with pillows on it. During that time he would mumble. No one could understand what he was saying. She saw him one or two days before the will was made. He was leaning forward and irrational at times. Miss Stewart would precede those who came and announce the name of the visitor. Jack F. Douglas, son of C. E. Douglas, saw his uncle Ralph a few weeks before his death. Ralph would frequently doze off. They were talking

about a hunting trip, and on one occasion Ralph said to Dr. Heisel, "Doctor, are you on the level?" The doctor replied, "Sure, Ralph, I am on the level, we're going on a hunting trip after you get well."

Casper H. Schultz, who had been connected with the John L. Douglas Company for several years, and was then its secretary, testified that he called to see Ralph shortly after Thanksgiving, and was told he could not see him. On the night of the 11th, Mr. Metz telephoned him that Ralph wanted to see him. The next morning he called on Ralph. He was met by Miss Stewart and taken upstairs. Ralph turned to him and said, "Cass, if I made a will—" Ralph then lapsed into unconsciousness and closed his eyes. He never completed the sentence. The following Saturday some one telephoned him that Ralph wanted to see him. Mr. Stewart met him and began talking about the will that Ralph had made. Mr. Stewart then told him about the stock, that Ralph said he wanted to give it to Jessie. He said, "No, sir, Ralph, you ought to give that to your mother." Finally he went up to see Ralph. Miss Stewart and the nurse were in the room. After they had spoken to each other, Miss Stewart said, "It is remarkable how well Ralph can spell your name." Ralph was then sitting on the bed propped up, with his eyes half closed, mouth partly open. She said, "Ralph, spell Mr. Schultz's name." Ralph lay back and started spelling, "SCHULTZ." She then told him to spell his first name. Ralph then started, "CASPER." He did not know what to say. His head would go up and sink on his breast. The witness then identified the contract drawn up between Mr. Douglas, Ralph, and Mrs. Metz concerning the common stock. When he saw Ralph about Thanksgiving he talked rationally. When he went back to see him in December he was told he could not see him. When he saw Ralph on the 12th day of January, Ralph said "hello" to him. When he saw him on the 22d Ralph could not talk at all, just mumbled. His head would sink on his breast, jerk up again, and look around continuously.

Daniel W. McNeil, general superintendent of the John Douglas Company, testified that he went to see Ralph once a week until his mother came. He then discontinued his visits until January 15th. Ralph was sit-

ting up, and that made him tired. He complained that he could not read. He generally saw Mr. Stewart after he came downstairs. Next to his last visit before Mrs. Douglas came Mr. Stewart said Ralph was very sick and he ought to make a will, that he did not know whether he had anything or not, in a joking way. He asked Mr. Stewart why he did not tell Ralph to make a will. Mr. Stewart said, "Oh no, I would not do that. That would be undue influence." When he saw Ralph on January 15th Ralph could not give an intelligent answer to any question, and asked him if he did not tear the machinery apart from New Jersey.

Dr. Oscar Berghausen first became acquainted with Ralph in 1921. He treated him for chronic nephritis and high-blood pressure. Ralph recovered from acute phases of the disease, but did not recover from the chronic condition. He went to see Ralph on October 25, 1927, at the instance of Dr. C. M. Heisel. After that he saw Ralph daily. An examination of his teeth showed infection, and the teeth were drawn. Following this he had a hemorrhage which lasted a few days. After this there was some improvement, but around Christmas Ralph became ill again. He was restless. His mental condition changed. He was flighty from time to time. He suffered from œdema, which manifested itself in his hands and eyes. About December 20th Ralph grew worse, and became irrational. He would become flighty, but would clear up quickly. In the early part of January he noticed that Ralph was getting worse. He had nausea and would become flighty. The period of disturbance would improve from time to time, and he would become mentally clear. Sometimes he was able to discuss questions and then he would have spells of mental cloudiness. Ralph was given from one-eighth to one-fourth of a grain of morphine and codeine sometimes two or three times a day, but usually once a day. Ralph became confused in an arithmetical computation about the first week in January. He had cerebral anemia. He saw Ralph the night of the day the will was made, and was of the opinion that he had mental capacity sufficient to enable him to make a will. On that evening he was clearer mentally than he had been for weeks, and was able to answer all questions and spoke of things they had spoken of before. On re-direct examina-

tion he admitted that on being told that Ralph had made a will he asked Dr. Heisel if he were mentally clear.

In response to a hypothetical question, Dr. David I. Wolfstein, a specialist in nervous and mental diseases, testified that he would say upon the case as a whole that such an individual was not in possession of his normal mental faculties, and would be at times unable to depend upon the processes of normal workings; that, while no one could say that at no time during the course of such disease he was not able to understand the nature of a will, it would have to be a favorable opportunity and within an hour or day, or part of the day when the individual might be an entirely different person. However, the indications to his mind were that the testator had a brain definitely affected, and its processes were not normal. In answer to the same question, Dr. Guy Eckman, who had been practicing his profession for 34 years, gave it as his opinion that the man was irrational, and was not capable of exercising the judgment that he should have in making a will. Dr. J. G. Furnish, who had been a physician for nearly 50 years, also gave it as his opinion that at the time of the making of the will there had been such deterioration, both mental and physical, that the testator was not competent to take cognizance of a matter of that kind. Dr. John E. Greiwe, a physician of 38 years' experience, gave it as his opinion that, under the facts stated in the hypothetical question, the testator was not competent to make a will. Helen Duvelius, who waited on Ralph Douglas for 2 weeks and 3 nights prior to his death, discovered on either the third or fourth day a slight irrationality. The flightiness she noticed was only for an instant, and then his mind would clear up. The flightiness was oftener after the first 3 or 4 days. As it went on he was gradually getting worse. The last few days of his illness he had a man nurse.

On the other hand, Richard C. Stewart, executor of the will, and father of Jessie Stewart, testified that for a number of years he and Ralph had been intimate companions, and their relations were very cordial and friendly. Ralph was superintendent of pottery of the John L. Douglas Company, and when at home went regularly to his work at the factory. He usually left for work about 8 o'clock, carried a lunch prepared by Jessie, and

ate his evening meal with them. Jessie and Ralph were engaged to be married. He never suggested the marriage to Ralph. In the latter part of October Dr. Heisel and Dr. Berghausen put Ralph to bed. Dr. Berghausen said, "Mr. Stewart, the young man is in a serious condition, his blood pressure is very high, and you had better talk to him about getting his papers in shape." His reply was that he could not possibly talk to Ralph about anything of that kind, for his feelings would not allow it, and he advised the doctor to get in touch with Mr. Metz and talk to him, as Ralph's father was in Florida. After that he saw Ralph every morning, and Ralph would greet him cordially. After his conversation with Dr. Berghausen he notified Mr. Metz, and wrote two letters to Mr. Douglas, and on November 24th Ralph telephoned his father and mother. When Mr. Metz suggested that he talk to Ralph, he replied. "You are the one, I would like for you to talk to him." On being asked if he said to Mr. Metz that he wanted Ralph to make a will, his reply was, "I didn't care if he made it or not. I did not know Ralph had anything. I was surprised at the money he had in the bank. I did not know of any bank account outside of the bank account in Covington." After Ralph's teeth were extracted and his nose was packed, he seemed to be getting better every day. From Christmas to early in January Ralph was up in his chair and in bed at times. He had a good appetite and ate his meals. About January 1st or 2d he noticed that Ralph was flighty. Ralph told him, "I tell you when I was in Canada I shot some deer and I shot more than I had any business to, I am afraid they are going to get me in trouble, you will find pictures of them in my bottom drawer." Up to January 11th he had not said anything directly or indirectly to Ralph about making a will. Possibly he mentioned what the doctor had said. When he left home on the morning the will was made he told Ralph good-bye. About 9 o'clock his daughter called him up and said, "Ralph wants to know if you can get in touch with Mr. McLean and Mr. Metz, and have them here at two o'clock, says he wants to fix up some papers." After that he went to Ralph's room. Ralph said, "We should get pencil and paper, I want you to make some notes." Ralph told him what he wanted done without any suggestions on his

part. At the direction of Ralph, he made the following memorandum:

"Cadillac—Jessie; Florida boat—My Dad; Vermillion Boat—Cora; Stewart Stock—Jessie; Bank Stock—Jessie; Coney Island Stock—Cora; Club Stock—Richard; Guns (1) Heisel—Bal. Clifford; Golf Clubs, etc.—Richard; Dog—Cliff Metz; Watch —Richard and Jack; Jewelry—Jessie; Bank Cash— Mother; Miscellaneous at Home—Jessie—Miscellaneous Outside—M. Jess & Cora; Douglas Stock— Mother, Father, Jessie & Cora, 1/11/1928. Garage Stock—Mary Alice."

At that time Mr. McLean had not arrived. When Mr. Metz came he showed him the card and said, "Here's the list of what he's got and what he wants to do with it." Mr. Metz said he would like to talk to Ralph. When Metz came out, he said, "Ralph, wants to give this Douglas stock to Cora." He said, "That's funny, are you sure of that?" Mr. Metz said "Yes." He said, "I will see him," and went in. He went in and asked if Ralph wanted to give the Douglas stock to Cora. Ralph said, "No, sir, I want to give it to Mother, Jessie, Mr. Douglas and Cora." About that time Mr. McLean came. He (witness) said, "Ralph will be looking for us in there, we had better go in." Mr. McLean said, "You can't go in." He said, "I thought you wanted Cliff and I." It was his first experience with anything of the kind. Mr. McLean went into the room and remained 20 minutes or longer. Miss Anderson, the nurse, came out, and said that Mr. Douglas had forgotten his garage stock, and wanted to give it to Mary Alice. Mr. McLean went back into the room. When McLean came out, he said, "R. C., Ralph has made you executor." He replied, "I don't want it. Give it to Cliff." At that time the will was in a sealed envelope. He did not know what was in the will except what Ralph had told him. When Mr. McNeil said, "Why don't you speak to Ralph?" he did not say, "Oh, no, I would not do that. That would be undue influence." Mrs. Douglas' statement that, after Ralph made the will, she found witness up there, was not correct. There were times when Ralph was tired and would doze off. At other times he was awake and would always recognize him and

talk to him. For a day or two after the will was made Ralph got along fairly well, so much so that he talked about making a trip to Florida. From that time until the 17th he always talked rationally about everything. On cross-examination he stated that Ralph had never talked to him about the common stock in the John Douglas Company. The last check that Ralph signed was on December 4th. After that he (witness) took charge of things.

Dr. Clifford M. Heisel saw Ralph on an average of about once a week for a period of 5 or 6 years. He first treated him in 1921. At that time he had an acute attack of Bright's disease. The case was chronic, and his condition was fairly serious. From 1921 to 1927 Ralph's general health outside of his Bright's disease was very good, and his mentality unusually good. In the month of September he found Ralph suffering from presbyopia, and recommended that another physician be called in. Ralph suggested Dr. Berghausen. Ralph improved enough to take walks with his nurse, and no mental disturbance was apparent. After that his condition was not so good. After the hemorrhage of his nose Ralph would have good and bad days, but the tendency was gradually downward. He would have mental disturbances and then return to normal. Ralph's condition had improved on January 10th, and his mental condition was clear. He saw Ralph about 1 o'clock on January 11th. Ralph told him he was going to draw up his will. He saw Ralph again at 8 o'clock. He was then mentally clear, but physically tired. He did not know before the will was opened that he was a beneficiary of the will. After January 11th Ralph grew worse. During the last 3, 4, or 5 days there were times when he was rational, but most of the time he was irrational. In his opinion, Ralph had capacity to make a will on January 11th. Miss Jessie Stewart, the chief beneficiary testified that Ralph had made his home with her and her father for 12 years. He talked naturally and normally about everything in general. He suffered a good deal when his teeth were extracted and the nasal pack was made. She did not think there was a time when Mr. Schultz did not get to see Ralph unless it was the time of the nasal pack. She may have detained him down stairs for a little bit while they were getting his medicine. She remembered when she telephoned her father about sending for Mr. Metz and Mr. McLean. Up to that time

she had never said anything to Ralph about a will, nor he to her, nor had her father ever made any suggestions about it. On the day before and on the day the will was made Ralph seemed perfectly all right. The day the will was made Mrs. Douglas came about 2 o'clock. She told Mrs. Douglas that Ralph had asked for her father, Mr. McLean, and Cliff to come over and take up some business matters, and that Mrs. Douglas had better remain down stairs. She did not recall saying that Ralph was signing some papers about the factory. Mrs. Douglas said that if she had known for one minute that her son was making a will she would certainly have gone upstairs to prevent it. She thought that when Mrs. Douglas went upstairs her father was not there. The time Mrs. Douglas heard Ralph screaming was the day before he died.

On cross-examination she testified that she and Ralph became engaged in the early part of 1924. Ralph was generous and open-handed, and in the habit of giving her presents of considerable value. At Christmas following their engagement he gave her a check for $500. He gave her a ring costing $4,500 in 1924, and a radio in 1925. The first time she noticed anything peculiar about Ralph's mental condition was the latter part of December or early in January. When one would go into his room he would be napping, when he awoke he would be startled and make some queer remark. Soon that would pass off, and he would be wide awake and all right. She did not notice this condition very often. On redirect examination she stated that she sent out some Christmas cards at Ralph's direction.

Miss Ruth Cree, who nursed Ralph from December 28th until the morning of January 7th, stated that his condition was fairly good and better when she went off the case than when she went on. His mind was always clear, and he talked very intelligently. Charles L. Costello, who married a niece of R. C. Stewart, testified that Ralph's mental alertness was a little above the average. He saw Ralph frequently during his last illness. Every time he saw him his mental condition was all right, with the exception of the last 2 days. Mrs. Blanche Anderson Schell, a trained nurse, took charge of Ralph Douglas' case on October 26th. Ralph was always jolly until three or four days before he died. The first time she observed any mental disturbance or flightiness was 3 or 4 days

before he died. On the morning the will was made, Mr. Douglas said, "Well, Miss Anderson, I am getting worse, you know it as well as I do. I must make a will today. Will you either call Dad Stewart, Mr. McLean or Mr. Metz. I want them to be here at two o'clock this afternoon. You can call them, or go down and ask Miss Jessie to call them." She told Miss Jessie, and she heard her call her father. Neither Mr. Stewart nor Miss Jessie ever said anything to her about Ralph making a will. After lunch on the day the will was made Mr. McLean, Mr. Metz and Mr. Stewart were all upstairs in the den. Mr. Douglas called for Mr. McLean. She left while they were talking. Later in the afternoon she was in the room when Mr. McLean went over the will. Mr. Douglas said that was what he wanted. After Mr. McLean went out of the room, she called him back, as Mr. Douglas had said something about forgetting some stock. On cross-examination she testified that Ralph had œdema in his feet at the time he died. She did not remember Mr. Stewart being in the room on the morning the will was made. She saw Ralph write his name. When he signed, his hand "kind of shook." He was in bed, nervous and sick. He knew he was going to die, and could not see very well. When Ralph complained of noise made by some men working across the street he said nothing about his father being there.

M. H. McLean, who drew the will, testified that he had been associated with Mr. Stewart as his attorney for a number of years. He considered Ralph Douglas as a man whose mentalities were considerably above the average. On January 11th he was in Mr. Stewart's office on some business matters. While there Mr. Stewart received a message over the phone and stated that Ralph wanted him to come to the house at 2 o'clock. When he arrived there, Mr. Stewart was on hand, and Mr. Metz was either there or came in shortly afterwards. When he started up the stairs, both Mr. Stewart and Mr. Metz started with him. He said, "Well, I will go in and see what he wants myself." When he went into the room, Ralph was sitting up in a chair and said, "I want to fix my will." Ralph told him the different items, and he would set them down as Ralph would give them. Mr. Stewart had a paper on which he had some memoranda. He made no suggestions to Ralph. He took it down just

as Ralph told it to him. After completing the memoranda, he went to his office. On returning Ralph told him he had some garage stock which he had forgotten to mention. Ralph then gave him the additional memorandum. He went to his office, prepared the will, and returned about 4:30. When he went back into Ralph's room they talked about who the witnesses would be. He said that he would be one, and some one suggested that he get the nurse, Miss Anderson. He read the will in Miss Anderson's presence, item by item, and when they got through he inquired of Ralph if that was the way he wanted his will, and Ralph said it was. At the time Ralph was fully at himself and knew what he was doing. He never disclosed the contents of the will, and nobody in the room saw the will after it was executed. He heard no discussion between Mr. Metz and Mr. Stewart after the will was executed as to what disposition was made of the Douglas stock. In his opinion Ralph had capacity to make a will. On cross-examination he stated that he never gave the Douglases any notice that the will would be probated. His relations both professionally and socially with Mr. Stewart had been very close, and he attended to business for him in various states. The other evidence is not very material.

The foregoing resume of the evidence speaks for itself, and extended comment will not be necessary. On the one hand we have the testimony of Mr. Stewart that Ralph's mind was all right on the day the will was executed, that Ralph told him what he wanted done with his property, and that the memorandum that he made at the time conformed to Ralph's wishes; the evidence of Miss Stewart that on the day before and the day the will was made Ralph talked naturally and normally about everything in general and seemed to be perfectly all right; the evidence of Miss Cree, the trained nurse, who nursed Ralph from December 28th until the morning of January 7th, that his condition was fairly good, and better when she went off the case than when she went on, and that his mind was always clear and he talked very rationally; the evidence of Charles L. Costello that he saw Ralph frequently during his last illness, and that his mental condition was all right, with the exception of the last 2 days; the evidence of Mrs. Schell, the trained nurse who took charge of Ralph on October 26th, that he was always

jolly, and the first time she observed any mental disturbance or flightiness was 3 or 4 days before he died; the evidence of Mr. McLean, who drew the will, that Ralph's mentality was considerably above the average, that he made no suggestions to Ralph, that he took down the memorandum just as Ralph told him, that Ralph was fully at himself and knew what he was doing, and that in his opinion Ralph had capacity to make a will; the evidence of Dr. Heisel that he saw Ralph at about 1 o'clock on January 11th, that Ralph told him that he was going to make a will, that Ralph's mind was clear, and that in his opinion Ralph had capacity to make a will; and the evidence of Dr. Berghausen that he saw Ralph the evening of the day the will was made, that he was mentally clearer than he had been for weeks, was able to answer all questions, and spoke of things they had spoken of before, and that in his opinion he had mental capacity sufficient to enable him to make a will.

On the other hand we have the testimony of Mrs. Mary Douglas that from the 1st of January on Ralph seemed to be in a stupor, was very drowsy, would sleep almost all the time, and used profane language in her presence, though he had never done so before; the evidence of John Douglas, father of Ralph, that on his first visit on December 24th he found Ralph sitting in a chair and in a daze, that he would doze off, brace up, and look at you in a wild way; the evidence of Clifford Metz that, when he arrived on the day the will was made, he found Ralph propped up in a chair with a table in front of him sprawled over the table; that Ralph would fall asleep, doze, and drop his head on the table, that at that time there were some men working in the street and Ralph said his father was working out there; the evidence of Mrs. Cora D. Metz that Ralph would mumble, that no one could understand what he was saying, that she saw him one or two days before the will was made, that he was leaning forward and was irrational at times; the evidence of Casper Schultz that he called on Ralph the next morning after the will was made, that Ralph turned to him and said, "Cass, if I made a will—" and then lapsed into unconsciousness and closed his eyes; the evidence of Daniel W. McNeil that when he saw Ralph on January 15th Ralph could not give an intelligent answer to any question, and asked him if he did not tear the machinery

apart from New Jersey; the evidence of Dr. Berghausen that about December 20th Ralph grew worse and became irrational, would become flighty, but would clear up quickly, and in the early part of January he noticed that Ralph was getting worse, that sometimes he was able to discuss questions, then would have spells of mental cloudiness, that he was given from one-eighth to one-fourth of a grain of morphine and codeine sometimes two or three times a day, but usually once a day, that he became confused in an arithmetical computation about the first week in January, and had cerebral anemia; the evidence of Dr. Heisel that after the hemorrhage of the nose Ralph would have good and bad days, but the tendency was gradually downward, and that he would have mental disturbances and then return to normal; the evidence of Drs. Eckman, Furnish, and Greiwe that Ralph was not competent to make a will, and of Dr. Wolfstein that a man in Ralph's condition was not in possession of his normal faculties, and could only make a will at a favorable opportunity; and the evidence that he told Mr. Stewart that he wanted to give the Douglas stock to his father, mother, Jessie, and Cora, that he told his mother, one of the nurses, and Mr. Metz that he wanted the stock to go to his mother, and that he told Mr. McLean that he wanted the stock to go to Miss Jessie after the death of his father and mother, with certain conditions.

It is apparent from this evidence that the testator's condition was growing worse, and that he was gradually approaching the end. His mind was clouded by disease, and the only ground on which the will may be sustained is that the testator was mentally clear at the time the will was executed. If the evidence of the witnesses for the propounders be accepted, he was. On the other hand, if the witnesses for contestants are to be believed, he was not. In the circumstances the case is one of mere conflict in the evidence, and it cannot be said that the verdict of the jury is flagrantly against the evidence.

But it is earnestly insisted that there was no evidence of undue influence, and that this question should not have been submitted to the jury. In this connection reliance is had upon the rule that it is not sufficient merely to show that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised, but that some evidence must be adduced showing that such

influence was actually exercised. Brent v. Fleming, 165 Ky. 356, 176 S. W. 1134; Childers' Ex'x v. Cartwright, 136 Ky. 498, 124 S. W. 802; Cecil's Ex'rs. v. Anhier, 176 Ky. 198, 195 S. W. 837. While the above rule is well settled, it must not be overlooked that undue influence can rarely be shown by direct proof, but is a matter to be deduced from the facts and circumstances leading up to, and attendant on, the execution of the will. Among the circumstances that may be considered are mental incapacity, confidential relations between the testator and beneficiary or his representative, active participation by the beneficiary or his agent in the preparation of the will, the exclusion of near relatives, and the result accomplished. Bradford v. Kinney, 216 Ky. 348, 287 S. W. 921; Fry v. Jones, 95 Ky. 148, 24 S. W. 5, 15 Ky. Law Rep. 500, 44 Am. St. Rep. 206; Lisle v. Couchman, 146 Ky. 345, 142 S. W. 1024; Yess v. Yess, 255 Ill. 414, 99 N. E. 687; Chappell v. Trent, 90 Va. 849, 19 S. E. 314; 28 R. C. L. 146.

We cannot draw the curtain and tell what occurred in the absence of witnesses, but the following facts are either admitted or supported by substantial evidence: The testator was weak in body and mind, and the end was approaching. He reposed great confidence in Mr. Stewart, the father of the beneficiary. The last check that the testator wrote was on December 4, 1927. From that time on Mr. Stewart looked after his affairs. Though told by his daughter to call Mr. Metz and the attorney for the purpose of having the will drawn, Mr. Stewart did not await their arrival. He went to the testator's room, and, while no one else was present, drew the memorandum introduced in evidence. When the attorney arrived, he presented to him the memorandum and said, "Here is the list of what he's got, and what he wants to do with it." After the attorney came out, he suggested to Mr. Metz that they go in and see Ralph together, and the suggestion was carried out. On entering the room he took a chair and moved it close to Ralph, and said, "Ralph, don't you want that stock to go to Jessie, the stock in the John Douglas Company?" Ralph looked up and said, "No, no, I want that to go to my mother." He then said to Ralph, "Well, when your mother is gone don't you want Jessie to have it?" Ralph turned to Mr. Metz and said, "Is that all right, Cliff?" Metz said, "Anything that you want to do, Ralph, is all right."

When this conversation occurred, the attorney had left with the memorandum, but the will had not been executed. Although it was recognized that her son was in a serious condition, yet when Mrs. Douglas arrived she was detained downstairs for a period of about two hours, instead of being taken upstairs within a few minutes, as had usually been the case. While downstairs she was told by Miss Stewart that they were going to have Ralph sign ''some papers,'' or ''some papers from the factory.'' When she went up stairs, she found Mr. Stewart in the room. He left immediately, and, after he went out, Ralph said he was going to die. When she protested, he replied, ''Oh, yes, I am, because they had me make my will.'' The John Douglas Company was a close family corporation. The common stock was a gift from the testator's father, who wished to control the corporation as long as he lived, and then have the control pass to those of his own blood. Though this purpose was known to the testator, he made a will by which a stranger in blood should own a large portion of the stock and share in the control and management of the business, and this in the face of his declared purpose that he wanted the stock to go to his mother. When we consider the result, and Mr. Stewart's active and persistent efforts in its accomplishment, in the light of all the attendant circumstances, we are constrained to the view that the evidence of undue influence was sufficient to authorize the submission of that question to the jury, and to sustain the verdict.

We have carefully examined the hypothetical question asked of the medical experts. It is unusually comprehensive, and fairly includes substantially all the facts that had been adduced in evidence at the time it was propounded. It was not necessary for counsel for contestants to anticipate the facts that were subsequently developed by propounders, but the duty of the propounders to cross-examine and submit such additional facts as they desired the experts to consider in giving their opinion to the jury. Axton v. Vance, 207 Ky. 580, 269 S. W. 534.

Complaint is made of the admission in evidence of the contract by which the testator held the 500 shares of common stock in the John L. Douglas Company. Under our law, one of the tests for determining the testator's soundness of mind is whether he had sufficient mental

capacity to enable him to know the character and value of his estate, and evidence bearing on that question is always admissible. Not only so, but evidence showing how the testator acquired the property disposed of is admissible (Floore et al v. Green, 83 S. W. 133, 26 Ky. Law Rep. 1073; Rhea v. Madison, 151 Ky. 262, 151 S. W. 667), unless too remote in time (White v. Cherry, 220 Ky. 664, 2 S. W. (2d) 1060), or it has no bearing on the justice or injustice of the will (Wigginton v. Wigginton, 194 Ky. 385, 239 S. W. 455). Here the contract was executed in 1921. It shows that the stock was a gift from testator's father, and that the testator was not to enjoy the income from the stock until the death of his father and mother. In the circumstances, the time the stock was acquired was not too remote, and the contract had a direct bearing on the fairness of the will. Therefore its admission was not error. In connection with the admission of the contract, complaint is made of the argument of counsel for appellee that the testator had forgotten the terms of the agreement because he gave his parents what they already had—a life estate. The contract discloses that the dividends from the stock were to be paid to testator's parents so long as they lived. Under the will they were given a life estate in the same stock. Whether counsel's argument was sound or not, we need not determine. It was based on evidence properly admitted, and cannot be said to be such an unfair deduction as to amount to prejudicial error.

Judgment affirmed.

Whole court sitting.