CASE 25—PETITION ORDINARY—November 25.

# Fry, &c., v. Jones, &c.

### APPEAL FROM LINCOLN CIRCUIT COURT.

In the contest of a will upon the ground of undue influence, the question of the existence and exercise of such an influence upon the testator is peculiarly one for a jury; and while the jury may not determine its presence without evidence of it, yet where it has been found by the jury to exist this court will hesitate to set aside that finding upon the ground that it is not supported by the evidence.

The evidence recited in the opinion in this case was sufficient to authorize the jury to find that the will in contest was procured by the undue influence of one of several daughters of the testator, who was hostile to one of her sisters, who, as the result of that influence, was virtually excluded by the will, the estate being equally divided among the other children.

J. W. ALCORN and J. B. PAXTON for appellants.

The court should have set aside the verdict as flagrantly against the evidence. (Bush v. Lisle, 89 Ky , 401; Zimlich, &c., v. Zimlich, &c., 90 Ky., 657; Hoerth v. Zable, 92 Ky., 202.)

MILLER & OWSLEY for appellees.

Cited: Jarman on Wills, ed. 1880, star pages 35, 36, 37 and notes; Snyder's Ex'or v. Cunningham, 13 Ky. Law Rep., 24; Wills, &c., v. Tanner, &c., 13 Ky. Law Rep., 741; Harrold, &c., v. Harrold, &c., 1 Duv., 203; Shropshire, &c., v. Reno, 5 J. J. Mar., 91; McDaniel's Will Case, 2 J. J. Mar., 331; Hunt's Heirs v. Hunt, 3 B. Mon., 565;

Fry, &c., v. Jones, &c.

Johnson v. Moore's Heirs, 1 Litt., 371; Carter, &c., v. Baird, &c., 11 Ky. Law Rep., 932; Smith, &c., v. Kelly, &c., 9 Bush, 558.

*JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.*

From the verdict of a properly instructed jury, finding the paper in contest not to be the last will and testament of Joseph Page, Sr., the propounders have appealed to this court complaining that such verdict is not sustained by the testimony, and is in fact flagrantly against it.

The testator died at the age of seventy-five years, the owner of a few hundred dollars' worth of personal property and a small farm in Lincoln county. He left as his only heirs, three daughters and one son. To one of his daughters, Mrs. Mary Jones, his first born, and for years his favorite child, he gave only the sum of $150, and devised the balance of his estate to the other three children in equal portions, save that to one of the three, Mrs. Jennie Adams, he gave $150 extra to compensate her for lack of educational advantages in her youth. Mrs. Jones contests the paper upon the ground of the testator's mental incapacity, and by reason of undue influence exercised over him.

It may be said of the testimony that it sufficiently establishes the mental ability of the testator to make the will, and unless the proof discloses a state of fact from which the jury could legitimately infer the existence and the exercise of an improper influence over him, the verdict must be set aside. It must be admitted that the rules by which may be ascertained the existence of a mental force or power so subtle and intangible as that denominated as "influence," or "undue influence," are not clearly defined or perhaps definable. Certainly

no general rule may be laid down by which this obnoxious force may be detected. We can easily say that the force must be such as to control the mental operations of the testator, and amount to a substitution of the will of the dominant over the weaker mind. But this is merely a statement of the effects of the inhibited influence. The question is how shall we detect its presence? Manifestly this may best be done by that tribunal to which is afforded the opportunity of meeting the witnesses face to face and hearing them testify in any given case. Before such the general bearing and conduct of all the witnesses, and especially the mental characteristics of those who are charged with having controlled another become matters of personal observation and oversight. To a jury of the vicinage, therefore, must be left in a large measure the detection of this refined and subtle, though reprehensible, power. They may not determine its presence without evidence of it, but we may well hesitate to determine the absence of such evidence when in their wisdom it is found to be present.

In the present case the testator had announced that " he would equalize his children in his estate." This was in the days of his physical and mental strength. In July, 1889, he was stricken with paralysis, a warning, however, which caused no change in his intentions. In August following he had a second and severer stroke. No one lived with him at that time, save his son-in-law Fry and wife, the daughter of the testator.

When the physician left the room on the occasion of this second stroke, starting home, this daughter, whom we shall presently see was hostile to her sister, Mrs. Jones, followed him out to the yard gate and asked

him to suggest the making of a will to her father. He returned, made the suggestion, and at the request of the testator, who said he had intended for some time to have one Cook to write his will, he came back next morning and wrote the instrument. This same daughter testified that her father, before this occasion, "had frequently talked to her about making a will, and always said he didn't intend for Mary to have any more than she had already gotten." The solicitude of this daughter that her father should be reminded of the alleged intention to cut off Mary, which he appears to have been about to forget, is worthy of notice, and especially as the proof is undisputed that Mary had only received from her father a cow and three sheep. The paralytic is left to rest under the delusion, however, that he had already provided for Mary. It appears that Mary, the contestant and appellee, had some years before the death of her father married her co-appellee, Jones, and did so with her father's approbation; but Jones became dissipated, and on several occasions, perhaps as many as three times, she left him and went to her father's. This troubled the old man greatly, and he advised her never to go back to live with her husband. He, at least, was willing enough to afford her a home, but her brother Joe was running the farm and refused to let her boy have a home on the old place. She therefore left, and again went back to her husband. She testifies that her father met her at Hustonville a month or so before his death and stopped her daughter and herself and talked to them kindly. That at no time did he ever speak an unkind word to her, and yet at his home, and when surrounded by the influences there, he is proven to have

said that when he died he didn't want this daughter to come to his burial; that he was done with her forever! When she went to see her brother Joe, whom she had learned was about to die, her father came out and met her in her buggy. This was away from the house; but when she went to the house she was refused by this same sister the right to see her brother, then "dying and unconscious." There was no remonstrance from the old man at such conduct. His kindness of heart and love for the daughter who had as a barefooted child played in his blacksmith shop in the days of his poverty, shone forth when out from under the influences of those living with him and controlling him. In their presence he was dumb and unable to protect her from insult or provide a home for her children.

The cruel hostility of Fry and wife supplying the motive for the suggestion to the physician that the will be written—which was to cut off Mary—is shown in their conduct only a few nights before the testator's death. The appellee, just after this final stroke, had gone with a lady friend to see her father. She was not admitted to his presence upon the plea that it was against the orders of the physician, and was told by her brother-in-law, Fry, that her father had said if she or "any of her children should die he would not attend the burial, and he did not want her at his;" and the friend calling with her was admitted only on the condition that she did not tell the old man that his daughter had come to see him! When this friend expressed her regret to Mrs. Fry that she and her sister did not speak, she was told that "she was not sorry, that Mary was no sister of hers." This bitter and open hatred on the part

of those surrounding this enfeebled and diseased old man toward the appellee, whose sole offense consisted in cleaving to her husband, it may be inferred, was a potent influence ever present and operating to control the testator's action. In the *frequent talks* on the subject of his will had by Mrs. Fry with her father, the reiteration of such harsh and prejudicial language to him in his dependent and helpless condition, would readily create an unnatural aversion toward the absent daughter and destroy the equilibrium of his mind.

That this hostile influence was exercised we can hardly doubt. The disposition to exercise it is shown by the proof, the opportunity was afforded, and the effects are apparent.

We can not say—in the face of the finding of the jury to the contrary—that the proof does not disclose the existence and the exercise of undue influence on the mind of this dependent paralytic, causing him to change the fixed purpose he formerly had of equalizing his children.

The judgment must be affirmed.