## Pinson v. Stratton, et al.

(Decided June 14, 1927.)

## Appeal from Pike Circuit Court.

1. Deeds.—Five year old child, though incapable of exercising undue influence or committing fraud in procuring deed, held chargeable with alleged fraud or undue influence, exerted in his behalf as grantee by his mother, in obtaining conveyance from father, who was claimed to have been mentally and physically afflicted.

2. Deeds.—In suit to set aside deed for fraud and undue influence, action of court in decreeing cancellation of deed procured from husband by second wife for herself and child, less than two months before husband's death, held not error, where husband was afflicted with disease and evidence tended strongly to establish lack of mental capacity.

3. Appeal and Error.—Chancellor's judgment was not reversed, where from consideration of entire record mind was left in such doubt that it could not be said with reasonable certainty that chancellor had erred.

STRATTON & STEPHENSON for appellant.

PICKLESIMER & STEELE for appellees.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Affirming.

By this action in equity appellees, children of W. R. Pinson by his first wife, sought to have cancelled a deed executed and delivered by him April 14, 1921, conveying all of his real estate to his second wife and their infant son, appellant, Theodore R. Pinson. Under the deed, the former took an estate for life, or during widowhood, and the latter the fee in remainder, defeasible upon his death without issue. The chancellor adjudged that the deed be cancelled, and the appeal is prosecuted by the guardian ad litem for the infant defendant, Theodore R. Pinson.

The deed was attacked upon the ground that the grantor did not have mental capacity to make it and that it was procured by undue influence. The facts developed in evidence are not as clear cut and convincing on either side of the two propositions as could be desired. Neither party introduced medical or expert testimony. The grantor in the deed, W. R. Pinson, died June 4, 1921, ap-

proximately 77 years of age, his exact age not being ascertainable from the record. He was a very fleshy man, and for a number of years had been afflicted with rheumatism, asthma, and heart trouble. The evidence satisfactorily establishes that due to his afflictions he had been confined to his home for some two years or more before his death. His first wife, the mother of appellees, died January 2, 1916. The appellees, their children, were all grown, had married and settled in homes of their own, and none of them lived with their parents. During the last few years of the life of the first Mrs. Pinson, she was an invalid, and he, on account of his afflictions, was unable to wait on and care for her as was necessary. In that situation Julia A. Maynard was employed to care for Mrs. Pinson, keep house, and do the cooking. She lived in their home in that capacity for the last three years of Mrs. Pinson's life. She was then approximately 35 years of age, and had previously had born to her an illegitimate child. One month and 14 days after the death of Mrs. Pinson, W. R. Pinson and Julia Maynard were married. This was on February 16, 1916. Appellant, Theodore R. Pinson, was born April 28, 1916. Mr. Pinson, his second wife, and the infant child lived together until June 4, 1921, when he died. He made the deed in controversy April 14, 1921.

Mr. Pinson was a veteran of the Federal Army of the Civil War, and received a pension from the United States. Aside from the real estate in controversy, he had no other property except $1,000.00 in cash which he had saved. It appears that before his marriage to Julia A. Maynard he gave her this $1,000.00. This fact was developed by her testimony, and she stated that he gave it to her to marry him. She was indefinite in her testimony as to how long the illicit relations had existed between her and Mr. Pinson before the death of his first wife.

The testimony for appellees tending to establish mental incapacity upon the part of the grantor comes entirely from themselves. Their testimony tends to establish that in the latter part of the winter of 1921 Mr. Pinson became so enfeebled, both in mind and body, because of advancing old age and the various diseases with which he was afflicted, as not to be capable of transacting business of any kind. All of them testified to numerous occa-

sions when they, his own children, visited him, that he did not recognize or know them, but would have to be told who they were. They also testified as to others with whom he had been acquainted for many years coming to see him while they were present whom he did not know. They testified as to his frequently requesting that he be taken to his home, believing himself to be elsewhere, though he then was in the home in which he had lived for many years. Other circumstances with which the opinion need not be burdened were testified to by them, and their testimony, if accepted, would seem to make a case authorizing a judgment avoiding the deed for lack of mental capacity upon the part of the grantor. It certainly was sufficient to establish that Mr. Pinson was in such condition both mentally and physically as to be easy prey to undue influence. Beyond the facts and circumstances hereinbefore summarized, no direct evidence for appellees was offered tending to establish that the deed was procured by undue influence.

In addition to the testimony of Julia A. Maynard Pinson, who married again approximately six months after the death of Mr. Pinson, the depositions of four disinterested persons, who lived in the vicinity and had known Mr. Pinson all their lives, were taken for appellant. Their testimony, while establishing that in the last year or two of his life Mr. Pinson was much enfeebled from his excessive flesh and the diseases with which he was afflicted, was to the effect that he retained his full mental vigor up to the last three or four weeks of his life, and that at the time the deed was made his mind was unimpaired. One of these witnesses, who was 26 years of age, testified that on several different occasions, and as far back as four years before his death, which was shortly after the birth of the apppellant, Theodore R. Pinson, Mr. Pinson had told him that, due to the fact that his children by his previous wife were grown and self-supporting, he intended to give all of his estate to his infant child in order that he might be supported while unable to care for himself and given the advantage of such education as it might afford him. The testimony from these witnesses as to Mr. Pinson's mental condition at the time the deed was executed was somewhat unsatisfactory, in that they do not appear to have had much opportunity, from their observation of and conversation with

him at the time, to form very satisfactory opinions on the subject. The following from the testimony of one of them is illustrative of the unsatisfactory nature of the proof:

"Q. Do you think from your observations of W. R. Pinson, on April 4, 1921, and prior thereto, he had mind sufficient to know the extent of his estate and its value and the objects of his bounty, and the duty to it? A. At the time I saw him, I think he knew what he owned, and all of them, but, as for knowing the objects of his bounty, I don't know. Q. I mean knowing his children and his duty to them, do you think he knew his children and his duty toward them? A. I don't know whether he did or not. Q. Why don't you think he knew his children? A. I said I didn't know whether he knew them or not, because I never heard him make any statement concerning that; I couldn't answer that."

Proctor Meads, the only witness who was present when the deed was executed, introduced by either party, testified for appellant. To illustrate the unsatisfactory nature of his testimony on the question of grantor's mental capacity, it is quoted in full:

"Q. Did you know that he made a deed to his son, Theordore Roosevelt Pinson, and his wife? A. Yes, sir; I was right there. Q. Did you witness the deed? A. Yes, sir. Q. Did you observe the condition of his mind? A. I never talked with him much. He asked me to go after the deputy clerk, and I asked him who he wanted, and he said 'Ira Deskins,' and I went and got him and took him down there, and he wrote the deed, and I left with him. Q. How was his mind at the time he executed the deed? A. I couldn't tell there was anything wrong with it. Q. How long have you been acquainted with him? A. I have known him all of my life. Q. Was his mind as good on that occasion as it had been before that time? A. It was as good as anybody's, had been from November to April; I never had much talk with the old man."

This witness had not previously seen Mr. Pinson for more than six months, and the unsatisfactory nature of

his evidence is further to be observed from the following question and the answer on his cross-examination:

"Q. I believe you say at the time that deed was made there, you had not talked any with the old man to ascertain just what was the condition of his mind? A. No, sir; I had not."

The deed recites that it was made in consideration of $1,000.00 paid in cash, and does not purport to have been made in consideration of love and affection. The record establishes that no consideration was paid, and that the consideration recited in the deed was false.

The facts of this case set it apart somewhat from any heretofore dealt with by this court to which our attention has been directed, in that the chief beneficiary under the deed is an infant of such tender years as to be incapable of exercising undue influence or committing fraud in its procurement. Though that be true, being the beneficiary under the deed, he necessarily would be chargeable with fraud or undue influence practiced or exerted by another for his benefit in its procurement. His interests and those of his mother are so closely interwoven as to be inseparable, and, if the deed made for his benefit was procured by undue influence or fraud exercised or practiced by her for him, it would necessarily follow that it thereby became so contaminated that it cannot be upheld, though the chief beneficiary is of such tender years as to be incapable of practicing fraud or exerting undue influence. Isaacs v. Isaacs, 206 Ky. 540, 267 S. W. 1104; and Smith, etc., v. Snowden, 96 Ky. 32, 27 S. W. 855, 16 Ky. Law Rep. 353, dealt at length with the effect that must be given in cases of this sort to the recital of a false consideration in the instrument attacked. What was there said need not here be repeated.

When Julia A. Maynard appeared on the scene, Mr. Pinson was surrounded by these circumstances: He and his first wife had struggled through a long life of comparative poverty and hardship together, and had reared and sent out into the world six children, who, so far as the record discloses, were leading honorable and useful lives. The hand of affliction had been laid upon both him and his wife; the end of the journey was almost in sight. These were circumstances leading naturally to stability of character and best calculated to cause him to stand

steadfastly true to his wife, their marriags vows, and the memories of their long lives together in the marriage relation. The record discloses, however, that before the death of his wife he had entered into illicit relations with Julia A. Maynard. Only six weeks after the first Mrs. Pinson had been laid to rest he gave to Julia A. Maynard the cash savings of a lifetime and married her. The child, begotten out of lawful wedlock, was born in about two months thereafter. Less than two months before death took him he conveyed his land, the only estate he had left, to her and their infant child. She was the strong; he was the weak. From these facts and circumstances it may fairly be inferred that she obtained and kept complete dominion and control of him.

The evidence for appellees tended strongly to establish lack of mental capacity at the time the deed was made; while the evidence for appellants tended perhaps as strongly to establish that the grantor, when the deed was made, was of sound mind. The chancellor weighed the evidence; had the advantage of acquaintance with the witnesses who had testified and a better opportunity to judge of their credibility. . He concluded that the deed should be canceled, whether for lack of mental capacity upon the part of the grantor or upon the ground of undue influence does not appear. From a consideration of the entire record, the mind is left in such doubt that it cannot be said with reasonable certainty that the chancellor has erred, if indeed the circumstances and facts in evidence and the reasonable inferences and deductions to be made therefrom do not preponderate in favor of the judgment returned.

For the reasons indicated, the judgment will be affirmed.