## Berryman et al. v. Sidwell et al.

March 24, 1939.

714

Benton & Davis, T. Stanley Clay and John H. Gardner for appellants.

D. L. Pendleton, Rodney Haggard and Harvey T. Lisle for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

This appeal involves the question as to whether or not documents probated on July 11, 1936, constituted the last will and testament of J. N. Bush, a bachelor, who died July 7, 1936, at seventy-seven years of age. His nearest relatives were a sister, the named appellee, and her son. Mrs. Sidwell's age is not given, but she was older than testator.

Mr. Bush was a successful farmer, spending all his life upon a farm in Clark County. He and his sister had inherited some land from their father. Mr. Bush was a careful, prudent man, leading a very simple life, and by industry and thrift had gradually increased his real estate holdings, until the time of his first will they totaled 367 acres of more than average quality. He had accumulated personal holdings evidenced by Government Bonds, to the amount of $26,000.

Mrs. Sidwell also lived in Clark County; part of the time with her brother, and later some distance from his home. She was not as thrifty as testator, since in some way she let the real estate left her, pass from her hands. Her husband died some time in 1930. The testimony shows that she and her brother had not kept in close touch with each other since her marriage, which was more than forty years prior to the time of the trial.

The proof does not show that any ill-feeling existed on the part of either toward the other. They just did not visit each other frequently, though in 1929 or 1930

the sister manifested an interest in her brother, and during his short stay in the hospital in 1930, where he had gone, as was said at her suggestion, she visited him as often as her health, means and opportunity permitted.

Out of the great mass of testimony there appears only one hint of any contrary feeling on the part of the testator toward his sister, and that came from Rev. Downey, who said that Mr. Bush spoke kindly of sister on all occasions, "except one time he said: 'I hope when I am gone my sister will not interfere with my affairs.' This is the only time he mentioned her in that way." There is no showing in the proof that the sister ever interfered in testator's affairs in any way, though she at one time made reference to certain provisions of the will as related to her.

In July 1930, testator then suffering with asthma and anemia, was taken to the hospital, remaining about two weeks, receiving tonic treatment which improved him somewhat.

The original will was executed on August 4, 1930. After providing for payment of debts and funeral expenses, testator bequeathed to his sister, $200; to her son, $2,000; to the son's two children, $100 each. He bequeathed $100 to a cousin, and to William McGlothen, Ollie Miller and Jessie Clem, $100 each. To the last three, testator explained, "because they have worked for me, and I make these bequests as a recognition of their faithfulness and kindness to me."

Following the bequests mentioned, testator devised and bequeathed the remainder of his estate in trust to the Citizens National Bank, to be used in establishing a Baptist Home for orphans on his farm. This trust was to continue until two county Baptist Associations might perfect plans for the organization and maintenance of the Home, whereupon the property was to be transferred to such organization. The testator expressed his desire that the Home be conducted in such manner as would permit the children to receive instructions in gardening, farming and domestic work, so they might become useful and self-supporting citizens. It was further provided that in case there resulted a failure to establish the home within two years, the estate should be turned over to Clark County for the purpose of maintaining a Home for orphan children. It was also provided that a

contract between testator and his tenant, Charles W. Berryman, expiring March 1, 1932, should not be disturbed. The trustee bank was nominated executor.

In October 1934 testator, apparently using the greater portion of the proceeds from a sale of Government Bonds, purchased the Curry farm, adjacent to his home, at approximately $83 per acre. Later, and prior to the execution of a codicil, the trustee bank ceased to function.

The codicil, executed on November 24, 1934, recited that since the execution of the original paper, testator had paid to the sister $200, the "legacy to her in said will is hereby revoked." Also that he had paid to his nephew the $2,000 provided in the original will, but same was not in satisfaction of the bequest, and he desired the sum to be paid him. He had paid to his cousin Annie Lawrence, and to Jessie Clem, $100 each; the original bequests were revoked. Testator expressed the "expectation" of paying before his death the other cash bequests, and if this happened any sum so paid should be credited to the extent of payment or gift.

Testator recited the interim purchase of the Curry farm, which together with his home place constituted "the principal part" of his estate; that the bank, named as executor and trustee, had passed out of existence, and in "lieu of said bank," he named Andrew Dykes, Jilson Whitsitt, G. L. Wainscott, Charles W. Berryman, and W. F. Jones, all of Clark County, as trustees "to take my residuary estate" and to have the same powers and duties as had been theretofore granted to the bank.

He reiterated that his estate was to be used for the purpose of maintaining on his land the Home for orphans, declaring that if for any reason the property should cease to be so used "within the spirit of the will," or upon failure of the Associations to perfect a workable organization, then Clark County should take over the estate and operate the home, and it failing so to do, the property should revert and become a part of his estate.

He again referred to a contract with Mr. Berryman, saying that he had leased the farm to him until March 1, 1937, and desired the contract carried out, adding:

"I have arranged with said Berryman that his lease

shall not interfere with the construction of any buildings for or in connection with said Orphans' Home, if it is desired to erect same before the end of his term as tenant."

Mr. Berryman was nominated executor without bond.

It appears in the evidence that testator had, prior to the making of the 1931 will, prepared one for himself, though neither it nor its provisions are shown in the record. The will and codicil were prepared by different attorneys.

The controversy between the parties arose upon the filing by Mrs. Sidwell, in the circuit court, a statement of appeal from the order probating the documents as the will of testator. She asked the court to annul the documents, on the ground developed later, that at the time of execution, testator was mentally incapacitated, and was unduly influenced.

After hearing proof (covering more than 800 pages) nine of the jury, under formally correct instructions, signed a verdict declaring that "the papers read in evidence are not the last will and testament of J. N. Bush, deceased," and judgment was entered accordingly, directing the county court to set aside the probating order. This was done and Mrs. Sidwell was appointed administratrix with the will annexed.

The question for our determination is whether or not there was sufficient evidence of mental incapacity or undue influence to uphold the verdict of the jury, which if determined in the affirmative will answer the contention of appellants that the court erred in not sustaining motions made at the close of appellee's testimony, and after all testimony, to direct the jury to find for appellants. We shall refer to appellees here (appellants below) as contestants, and appellants here (appellees below) as contestees.

Counsel for contestants argue that the only question presented is whether there was a scintilla of evidence of the lack of mentality, or of undue influence, in support of the jury's verdict for contestant. Counsel for contestees argue that there was insufficient proof and suggest that, "even if any question should have been submitted to the jury, the court had nothing on which to base this instruction as to undue influence." It is also argued that contestants were erroneously allowed to introduce incompetent evidence.

We approach a brief discussion of the facts with two self-evident propositions facing us. The questions at issue were presented to the jury in well-worded instructions, and that jury which saw and heard the witnesses testify, by solemn verdict concluded that the papers presented did not constitute the will of testator. Whether they so found from a consideration of the evidence as to mental incapacity, or undue influence, or both, we have no means of knowing; however, we can only reverse if we find that the verdict is clearly and palpably against the weight of the evidence.

The will and codicil were in evidence, and read to the jury. We have held that if the will itself be "reasonable, just and natural, it tends to establish capacity in the testator and to prove that it was freely and voluntarily made. If unnatural, inconsistent, or unjust in the disposition of the estate among the natural objects of testator's bounty, it tends to prove the contrary." Moran's Executor v. Moran, 248 Ky. 554, 59 S. W. (2d) 7; Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948.

We have written that if any of its provisions appear unnatural, the burden rests upon the propounders to give some reasonable explanation of its unnatural character. In Woodruff's Ex'r v. Woodruff, 233 Ky. 744, 26 S. W. (2d) 751, we quoted with approval from the Walls case, supra. In Guffy v. Gilliam, 213 Ky. 805, 281 S. W. 1024, 1025, and McGee v. Brame, 176 Ky. 302, 195 S. W. 473, we cited and quoted from the Walls' case, supra, as follows:

"Incapacity opens the door to undue influence, and when opportunities for such influence are shown, and the favored devisees are the beneficiaries of a will unnatural in its provisions, to the exclusion of others having equal claims at least upon his bounty, very slight circumstances are sufficient to make the question of undue influence one for the jury."

We also said in the Walls' case, supra:

"Direct proof of undue influence can seldom be had. Like fraud, it must be proved ordinarily by circumstances, and, though each circumstance standing alone might be quite inconclusive, yet the effect of all the circumstances when taken together may be more convincing."

Aside from the fact that the sister of testator was

practically overlooked in disposing of his property by testator (which fact is not alone sufficient to invalidate the will), Jackson's Ex'r v. Semones, 266 Ky. 352, 98 S. W. (2d) 505, there are other features to be considered in surveying the documents, one that testator's plan to take care of orphan children under his trust seems to have been neither practical nor feasible.

It is fairly well established by witnesses, some indirectly interested, and a few without show of interest, that Mr. Bush for many years had expressed a purpose to do something for orphan children; to do something for an orphans' home; to see that orphan children were provided for. To one he said he hoped to help the Louisville Orphans' Home. In later years he indicated that he wanted to turn his home farm and other property over to some organization for the purpose of conducting an Orphans' Home. When he executed the original will he had in giltedge securities about $26,000, which, had he carried out his original idea, would have assisted materially in fulfilling his plans.

After it became known that testator had expressed the commendable intention to aid orphan children, there began more or less activity on the part of interested persons (perhaps indirectly) to aid him in carrying out some plan. In 1924 or 1925, testator's pastor called on him for a contribution to an intensive campaign then being conducted in behalf of the Church. Rather casually, as is claimed, the pastor asked Mr. Bush what he intended to do with his property if he "were taken away." Testator replied that he had often thought of leaving it to the Orphans' Home. Later, the superintendent of the Louisville Home, and its enlistment man, had testator sign an agreement to the effect that he would give his farm to the Louisville Home for the care of orphans, "preferably from the territory" of the Associations named above. If it were not practical to build on the farm, then it was to be run as a dairy farm to go toward the support of the Louisville Home. There was a further consideration that the Home was to pay to Mr. Bush an annuity of $800 each year during his life; this writing took care of the Berryman lease.

This proposal did not meet with the full approval of the officers of the Louisville Home; later they accepted it, but incorporated in the proposal a provision that the Home, in its discretion, might take charge of the farm, rent it for five years after the death of testator, for

money consideration, and then if the plan was not workable, the officers of the Home might sell and create an endowment fund for the Home. This plan fell through, because, as witnesses opined, "the sale clause knocked it out."

Prior to the making of these proposals, at the instance and request of the officers, Mr. Bush visited the Louisville Home, the purpose being to have him see the working of the institution. While there, or soon thereafter, he said to the superintendent: "I see why my plan won't work."

Nevertheless, when he came to write the codicil to his will, after he had invested practically all his cash in the Curry farm, he so framed it that the Home would have no working capital. Witnesses, who were qualified on the subject, gave testimony as to the impracticability of operating an orphans' home without funds behind the project. It was pointed out that the intention of the testator was to make the project a self-sustaining one. The impracticability of this was evident. It was equally as obvious that the two Associations, members of which were trustees, could not maintain the Home if any appreciable number of children were to be sustained.

The evidence on this point is that complained of as being erroneously admitted over the objections of contestees. We think that it was competent, as tending to show that in the later years of his life, and at the time of making the will, and particularly the codicil, testator did not have the business acumen and ability to manage his affairs, attributed to him by numerous witnesses.

Testator, after bequeathing to his sister the sum of $200, gave to McGlothen, Clem and Jessie Miller, $100 each, explaining that the bequests were in recognition of faithfulness and kindness. It is shown in the proof that the parents of Ollie Miller had only lived on testator's farm a little more than one year (1907-08), at which time Ollie was only sixteen or seventeen years of age, though she did occasionally visit Mr. Bush during later years. Clem had worked for testator in the past. He did not testify. McGlothen's father was a tenant on testator's farm from 1913 to 1916, and again in 1920. The boy was under ten years of age when his parents left the place, and his father said that Mr. Bush had not seen much of him since 1917. The boy had not visited testator often.

It appears from the record that within four months after writing the codicil, March 25, 1935, Mr. Bush executed a deed conveying all his lands to the same persons who had been named trustees in the codicil, providing for the maintenance of the Home, reserving to grantor a life estate, but vesting the trustees with power to construct the Home and make improvements on the land during his life. If within a period of three years construction be not begun, or if at any time there was failure to use the property for maintaining an Orphans' Home, the estate was to revert to grantor and his heirs. No part of the cost of construction or maintenance of the Home was to be a charge on the land, and the trustees were prohibited from selling or encumbering the land. There was no conditional grant to Clark County, but it was provided that in certain contingencies, some other charitable organization might conduct the Home.

The Berryman lease was taken care of in this deed. Following its execution the trustees began plans for building, perhaps getting as far along with the work as laying a foundation. Mr. Bush, though quite ill, was taken to the site to observe the corner stone laying services.

When we read the testimony relating to the mental quality of testator, there is, as is usual in such cases, a sharp conflict. It is impractical to go over the testimony in detail. Propounders of the will agree that at least after 1930, Mr. Bush was physically weak. He was taken to the hospital in July 1930. Dr. Young had been testator's regular physician, but on this occasion he was attended by Dr. Henry for two weeks, when, without being discharged, Mr. Berryman took testator home, as he says, because he could not sit up with him at night, but could help him if at home.

Dr. Henry said that Mr. Bush was in a grave condition when he came to the hospital. He was very weak because of anemia, and a condition of senility; a weakening of both the body and the mind. "He was in no condition to attend to any business when I saw him." Knowing his condition prior to 1928, that he was able to ride around, and look after his affairs, the doctor said the symptoms observed would account for his decline. He was not normal while at the hospital. He was very weak, apparently disorientated, unconscious of his surroundings; out of his bed a great deal, particularly at night. Asked an hypothetical question, based

on circumstances then in proof, some of which will be referred to later, the physician testified that at the time he was at the hospital Mr. Bush was not mentally capable of making his will, or attending to any business. The physician did not see Mr. Bush after he left the hospital, but he said unequivocally, that unless there was a radical change for the better, Mr. Bush was not qualified to transact any business in 1931 or in 1934. The proof clearly shows a change for the worse rather than for the better. Most all the witnesses so agree when speaking of testator's physical condition.

Dr. Young said that Mr. Bush had suffered a broken leg fourteen years ago. The physician had waited on him then, and intermittently, though not frequently, up to and through his last illness. Mr. Bush asked the physician about going to the hospital, and he told him it would be all right. He went more into detail in regard to Mr. Bush's physical condition than had Dr. Henry, and said: "In addition to anemia Mr. Bush suffered greatly from asthma; he had arthritis and a gouty condition." It was also shown that he had Bright's disease, which was "highly progressive. The mind of a person suffering from this disease for ten or twelve years becomes affected." Dr. Young in answer to the pivotal question as to his ability in 1931 and 1934 to know his property, relatives, duties, etc., said:

"I would judge that he was. Of course, he never told me any of his business, but from a professional standpoint I never could see any difference in him and anybody else. I judge it that way; that his mind was sufficient to do business as he wanted to."

Other physicians testified for propounders, but as we read this evidence it does not appear to be of probative value from a professional standpoint. Dr. Clarke visited Mr. Bush once in 1933; called when testator thought he had suffered a fractured rib, though it developed to be nothing more than a bruise from a fall. He was there only a short while. Mr. Bush talked intelligently in describing how he had fallen. Asked the question, basing it on what occurred on the visit, and his "acquaintance with and knowledge of him," he answered that he thought he had mental capacity, saying, however, that it had been "probably some years" prior to 1933, when he had seen Mr. Bush. He never discussed his business, property or relatives with him;

only asked him some questions on the visit to ascertain the manner and extent of his injury.

As to the lay witnesses, it appears from the record that those who testified as to Mr. Bush's good mental qualities, outnumber those who testified otherwise. These were friends, neighbors and relatives, and some of those were of the churches, or associations, interested to some extent in the plans of Mr. Bush. The attorneys who wrote the will and codicil also gave favorable evidence as to Mr. Bush's mental capacity.

It is true, as said by counsel for propounders, that there is little showing by oral testimony of any irrational thing said or done by Mr. Bush, but it is apparent that after Mr. Bush returned home, after his stay at the hospital, his association with others was limited. A few of his old friends, some of his former tenants, and a few relatives visited him.

It is not subject to dispute that after 1930 Mr. Bush grew gradually worse, physically, and demanded much attention, not of professional nature, particularly at night. Many who observed him after his return from the hospital, say he seemed not to pay any attention to anything. One witness said that he "seemed to be like a man doped; took no interest in anything unless his attention was called specifically to some particular thing." Another said that when asked how his farm was getting along, "he would say he didn't know anything about it." Up to the time testator began to gradually fail in health he had taken a great interest in his farm. One witness said that when Mr. Bush was asked questions he would "just say 'yes' or mumble something."

In 1935 it appears that there was a gathering of some sort on Mr. Bush's farm, perhaps a church picnic. Mr. Bush was taken out to the picnic in his night clothing. There was to be an announcement made relative to the Orphans' Home plan. One of the trustees, or a pastor, had the people assembled to go speak to Mr. Bush, but not to "raise any conversation." One witness said he did not show any interest in what was going on; that he "looked like a wild man."

The foregoing is a trend of the lay testimony, and while it may be admitted that the circumstances related, standing alone, would not clearly indicate lack of capacity, they are to be considered along with other proof, acts and circumstances. Such as it was, we are of the

opinion that when so considered and with Dr. Henry's positive testimony, it was sufficient to take the case to the jury on this subject.

Mr. Berryman, mentioned in Mr. Bush's original will as his tenant, was named one of the Home trustees in the codicil, and also executor without bond. Mr. Berryman had been a tenant on the original farm in 1925 and 1926. Under his contract he tended crops on the shares, and shared the mansion house. Mr. Bush occupied a part of the house and paid Mr. Berryman $4 per week board. He became a tenant again in 1928, and remained such until Mr. Bush died.

From 1928, up to the first of the year in which Mr. Bush went to the hospital, Mr. Berryman paid $1,000 per year rent, and Mr. Bush continued to board with him at $4 per week. For 1930 the board continued as before, but the rental was reduced to $850 per year. For 1931, and up to 1934, the rental was fixed at $800 per year—Berryman to cut weeds and do the fencing, and Mr. Bush to pay $800 per year for his board and attention. For 1934 the same contract existed, and Mr. Bush was to pay Mrs. Berryman $10 per week additional for caring for him.

In the fall of 1934 the Curry farm was bought by Mr. Bush, and a written contract was then made, by which Mr. Berryman was to have the use of more than 600 acres for the care of Mr. Bush and the payment of $300, or more, taxes on the farm. It was provided that if Mr. Bush died during the lease period, Mr. Berryman was to pay for the balance of the period at $1,200 per year. It is pointed out that at the time of the contract for 1935, which was for two years, Berryman was paying $1,400 per year for the Curry farm.

It is shown that prior to Mr. Bush's trip to the hospital he had fairly-well managed his business; paying his bills, trading and signing his own checks. After he went to the hospital, and after his return home, he signed very few checks, and attended to little business. Mr. Berryman sold some bonds for Mr. Bush to pay off the bequest to his nephew, and also to pay for the Curry farm; Berryman signing all checks drawn against Mr. Bush's account, with the exception of a few which were signed by Mr. Bush for some especial reason, advanced by others than Mr. Bush.

It is clear from the proof that Mr. Berryman fared

well under his contracts with Mr. Bush. The record before us shows that in 1928 Mr. Berryman listed property to the extent of $654; in 1936 he listed more than $22,000 in property, but owed some on a tract of land, which reduced his worth to a little over $14,000. It is not insisted by counsel, nor do we find anything in the record to show any untoward or dishonest act on the part of Berryman. It may be that he was thrifty and saving, though it is made to appear that during his rental of the Bush farm there were several lean years. It is pointed out by counsel for contestants, that these facts, together with others, and with circumstances, show a "revolutionary" change in the affairs of Mr. Bush in later years, particularly after his return from the hospital.

The transactions, or some of them, have a tendency to indicate that Mr. Bush was not the careful prudent business man that he was in earlier years.

It is admitted that there was no ill-feeling between Mr. Bush and his sister. Many witnesses say they never heard him mention her name, but say "he did not make much fuss over anybody." Others say he was on friendly terms with her; seemed to be fond of her. It is clear that Mr. Bush was cognizant of his sister's poor financial condition.

It will be recalled that just before the codicil was written Mr. Bush had purchased the Curry farm, thus reducing his personal holdings by the amount paid for it. Mr. Bush did not, under the terms of his rental contract, have an opportunity to accumulate much after 1930. The purchase of the farm and the failure of the bank would, of course, offer a reason for the codicil. Perhaps the payment of several of the bequests would be so. However, it is pointed out that in the codicil Mr. Bush names as trustees five persons, to some of whom he later had an introduction, and none of the five, save Mr. Berryman, were his friends or well-known to him.

When the time came to write the codicil, written by attorneys who had not written the original will, Mr. Bush made some suggestions, but a slip of paper containing the names of the trustees was handed to the attorneys. It does not appear that Mr. Bush selected them, or had a great deal to do with their selection.

Mr. Bush had written a will prior to going to the

hospital. He talked to Mr. Berryman about it; he told him where it was, and later Mr. Berryman found it, but it was never produced, nor was any mention made of it, except Mr. Berryman said that Mr. Bush told him: "I haven't got anything in it for you and your wife; I feel like I am paying you all as I go along, and feel like my property would do more good going to the orphan children." It is pointed out that at the time this statement was said to have been made, Mr. Bush was only paying $4 a week board, and Mr. Berryman was paying $800 or more rent.

It is shown by Mrs. Berryman that after the visit to the Louisville Orphans' Home, Mr. Bush discussed the subject of disposition of his property with her and Mr. Berryman. She says he discussed it quite often, "mostly around the fire with Charlie. He wanted it fixed so it would be *there*; he wanted it fixed so there would be no law suit; he wanted to get it fixed right."

Mrs. Sidwell said her brother told her once, perhaps in 1933, that he had made a will. At this or another time, she said:

"When he spoke to me he said he had a will and did I think anyone ought to have the right to do what they pleased with their property, and I told him 'yes, I suppose they did.' He asked me if I would break his will, and I told him 'no, I wouldn't,' and then says: 'Will $4,000 do you?' I said 'Yes,' and I think that about ended the conversation."

Mrs. Sidwell says Mr. Berryman heard this conversation. It later becomes significant.

Mrs. Sidwell said that later she met Mr. Berryman in town.

"I asked him about my brother, about his health, and the conversation came about in some way, I don't know just how, but Mr. Berryman anyhow told me that my son would get $2,000, and I would get $200.00. I said 'Well, that will help out,' but don't you remember my brother said, would $4,000 do me, and I said 'yes' and Mr. Berryman said he didn't remember it that way."

Mr. Berryman testifying on this point says that he heard the conversation between Mrs. Sidwell and Mr. Bush, but he says "and Mr. Bush says 'would $4,000 suit

you all?' and Mrs. Sidwell answered, 'yes, whatever you do will suit *us.*'" As to the later conversation between Mrs. Sidwell and Mr. Berryman he says that he met her on the street, and the conversation was about as she detailed it, except as to the use of the words "you" and "you all." He says further that at a later time when Mrs. Sidwell was at the brother's home he went into the room where Mr. Bush was, and he said:

> "She didn't understand this giving $4,000 thing, and said: 'How do you remember my saying it?' I said, 'I remember you saying, "would $4,000 suit you all?"' He said, 'that's what I thought I said, would $4,000 suit you all?'"

In the original will Mrs. Sidwell's son had been given $2,000 and Mrs. Sidwell $200; the codicil recited payment to her and revoked the bequest. It also recited payment of $2,000 to the son, but he was to get $2,000 more under the terms of the will and codicil.

Mr. Berryman was asked by counsel if at any time since he had known Mr. Bush he had "ever in any way tried to influence him in the making of his will or any codicil to it?" He replied:

> "Not in the will, I made some suggestions in the codicil. He discussed with me about Mrs. Sidwell, and I told him that I thought Mrs. Sidwell was the one should get his property, as she would take care of it and anyway Asa would get it after she was through with it."

Then followed this testimony:

> "Q. What property are you referring to? A. Some money he was going to give Asa.
>
> "Q. How much did he say he was going to give Asa? A. $2,000.
>
> "Q. Now is that the only suggestion that you made to him about the codicil or will? A. Yes, sir, that is the only one I can recall right now."

Mr. Berryman also says that "along toward the last years of his lifetime Mr. Bush told me he thought I knew more about his will than anybody else, and what he wanted to do, and he wanted me to do what I could to see that it was carried out."

Counsel who wrote the original will said that Mr. Berryman came to him to go to the residence and write

the will. He also said "another man" had spoken to him about the making of the will, but he was sure this person was not representing Mr. Bush.

It was said that the will was written out in the yard at the suggestion of Mr. Bush, because "the house might have ears," yet we find that it was at times discussed, and later, after the codicil, announced publicly insofar as it dealt with the Home. It is shown that Mr. Berryman was very active in seeing that the codicil was prepared. He went several times to the attorney who had prepared the will. On account of pressing business and other matters, the attorney advised Mr. Berryman to get other attorneys.

In speaking of the codicil Mr. Berryman said that Mr. Bush had suggested seeing the attorney who had written the will, directly after the bank which was nominated executor had closed. The attorney advised Mr. Berryman, as he says, that "it wouldn't make much difference about the bank closing." After the purchase of the Curry farm he went to the attorney again, who suggested that he see another attorney, a very satisfactory reason for the suggestion being given by the first attorney. The attorneys preparing the codicil took notes at the bedside of Mr. Bush, and it was prepared in the office. Mr. Berryman was present in the law office, discussing it with counsel before it was completed.

On cross-examination Mr. Berryman said that Mr. Bush was not wanting a codicil on account of the purchase of the Curry land, but because he wanted to change executors. He knew of no other change in his will that Mr. Bush wanted made. Counsel who wrote the first will said that Mr. Berryman said Mr. Bush wanted him named as executor, "I don't know whether he said trustee then or not." This attorney also said that he went out without appointment at one time, shortly before the codicil was written, to discuss his will, but did not do so, since Mr. Bush was "apparently suffering, in pain, because his breathing was quite disturbed; quite a rattle in his throat."

When testator executed the codicil it was witnessed by Mr. Berryman, Mr. Downey and Mr. Heflin, and the latter suggested that Mr. Downey "read it so we will all know what it contains," and he "read it out loud." It does not appear that Mr. Bush made any suggestions as to it being read "out loud" or at all.

It is noted that one of the five named trustees did not testify. Mr. Dykes and Mr. Whittsitt were called, but were not asked as to Mr. Bush's mental capacity. Mr. Jones testified from a psychological standpoint, and concluded that Mr. Bush was mentally sound, though he had only seen him once, and then for a brief time. This may not be significant, except to indicate that perhaps those named to carry out the trust (excepting Mr. Berryman) had a slight acquaintance with Mr. Bush. One witness testified that Mr. Bush got him to bid on the Curry farm, which he bid in for him; that afterwards they brought him some papers to sign and he was able to sign them without help.

We think we have given enough of the testimony to indicate that there was sufficient proof to carry the case to the jury on both questions. We are also of the opinion that the testimony was such as to justify the verdict rendered, or stated otherwise, that the verdict was not palpably against the evidence. In the case of Fry v. Jones, 95 Ky. 148, 24 S. W. 5, 6, 15 Ky. Law Rep. 500, 44 Am. St. Rep. 206, in speaking of the exercise of undue influence, we said:

"The question is how shall we detect its presence? Manifestly, this may best be done by that tribunal to which is afforded the opportunity of meeting the witnesses face to face, and hearing them testify in any given case. Before such, the general bearing and conduct of all the witnesses, and especially the mental characteristics of those who are charged with having controlled another, become matters of personal observation and oversight. To a jury of the vicinage, therefore, must be left in a large measure the detection of this refined and subtle, though reprehensible, power. They may not determine its presence without evidence of it, but we may well hesitate to determine the absence of such evidence when in their wisdom it is found to be present."

Here the contest was not based on undue influence alone, but as well on the lack of mental capacity. A reading of opinions of this court demonstrates that if the claim be lack of testamentary capacity alone, the evidence should be more convincing than is required when the two grounds are coupled. Here we have evidence of Mr. Bush's gradually failing health after 1930, due to his affliction with several diseases, any one of

which would weaken him, and one in particular, which, if its course runs for any length of time, has a great tendency to weaken the mental faculties.

It is strenuously argued that since Mr. Berryman was not to directly benefit by the will or codicil, he could have no possible motive in exerting influence. We are not called upon to search for motives. As we read the record there is some evidence of a subtle influence on the part of those interested in seeing the farm turned over for an Orphans' Home. Some of the persons interested did not know Mr. Bush had a sister, or if so, that she was practically penniless. In Stege v. Stege's Trustee, 237 Ky. 197, 35 S. W. (2d) 324, 330, we wrote:

> "The exercise of effort which produces the will or deed need not be by the beneficiary directly, but may be through agency (Stewart v. Douglas [235 Ky. 121, 29 S. W. (2d) 637], supra), or by a third person (Pinson v. Stratton, 220 Ky. 557, 295 S. W. 859), or by one to keep another from inheriting (Wall v. Dimmitt, 114 Ky. 923, 72 S. W. 300, 24 Ky. Law Rep. 1749, and subsequent appeals)."

In Stewart v. Douglas, 235 Ky. 121, 29 S. W. (2d) 637, after pointing out that a showing of opportunity to influence was not sufficient to set aside a will, we said:

> "While the above rule is well settled, it must not be overlooked that undue influence can rarely be shown by direct proof, but is a matter to be deduced from the facts and circumstances leading up and attendant on, the execution of the will. Among the circumstances that may be considered are mental incapacity, confidential relations between the testator and beneficiary or his representative, active participation by the beneficiary or his agent in the preparation of the will, the exclusion of near relatives, and the result accomplished. Bradford v. Kinney, 216 Ky. 348, 287 S. W. 921; Fry v. Jones, 95 Ky. 148, 24 S. W. 5, 15 Ky. Law Rep. 500, 44 Am. St. Rep. 206; Lisle v. Couchman, 146 Ky. 345, 142 S. W. 1023; Yess v. Yess, 255 Ill. 414, 99 N. E. 687; Chappell v. Trent, 90 Va. 849, 19 S. E. 314; 28 R. C. L. 146. * * *

> "When we consider the result, and Mr. Stewart's active and persistent efforts in its accomplishment, in the light of all the attendant circumstances, we are constrained to the view that the evidence of

undue influence was sufficient to authorize the submission of that question to the jury, and to sustain the verdict.''

We have examined the authorities cited by counsel for contestees as upholding their contention. That examination discloses that such may be easily distinguished on facts from the case at bar. Some deal with the question of lack of capacity; some with the matter of exercise of undue influence, and others with both. They are not controlling. In cases dealing with the questions before us, experience has shown that no two can be said to be alike. We must take the facts as they appear in the case under consideration, and apply the settled rules of law as we find them. We have held that in determining the issue of undue influence a jury might take into consideration the age of testator, evidence of his physical condition as to enfeeblement, likely to impair the mental faculties. Duval v. Duval, 249 Ky. 186, 60 S. W. (2d) 351.

Under our law the verdict of a jury in a will case is controlled by the same rules as apply to a jury's verdict in any civil case. We are therefore to determine by these standards whether in the case before us the evidence presented was sufficient to take the case to the jury, and to furnish substantial support for the jury's conclusion; as measured by these rules, laid down in numberless cases, it is our opinion that the evidence on both questions presented in issue, was of sufficient and substantial nature to sustain the attack made upon Mr. Bush's will. While juries should not be permitted to set aside a will upon mere remote or speculative evidence, because the terms may not be in accord with their ideas of propriety, and equality, it is equally as true that this court is not authorized to substitute its judgment for that of the jury, where there is evidence of a substantial and probative nature to support the verdict. Langford's Ex'r v. Miles, et al., 189 Ky. 515, 225 S. W. 246.

The conclusions we have reached obviate the necessity of passing on the motion to strike from the files an answer filed in this court on behalf of Mrs. Sidwell.

Judgment affirmed.