Denver MAYHEW, Appellant,

v.

Dale MAYHEW et al., Appellees.

Court of Appeals of Kentucky.

Nov. 6, 1959.

Douglas Keen, Scottsville, Robert M. Coleman, Coleman, Harlan & Orendorf, Bowling Green, for appellant.

N. G. Goad, James S. Secrest, Scottsville, for appellees.

STEWART, Judge.

This is a will contest case. The lower court sustained the motion of defendant-appellees, Dale Mayhew and his wife, Mary Dee Mayhew, for a judgment notwithstanding the verdict of the jury which held against the will and a codicil thereto. The basis of this appeal is that plaintiff-appellant, Denver Mayhew, introduced sufficient evidence to warrant submission of the case to the jury on the ground that both documents were procured by appellees through their exertion of undue influence upon the mind of the decedent. We shall hereinafter use the Christian names of the contestant (appellant) and the contestees (appellees) when reference is made to them.

Denver and Dale are the sons of Minnie Mayhew, deceased. The latter, on March 2, 1949, executed a writing, purporting to be her will, leaving all her estate to Dale, except for $1 to be paid Denver. On August 31, 1955, she executed what is alleged to be a codicil, changing the disposition of her property only to the extent that it should be divided equally between Dale and his wife, Mary Dee. No question is raised as to the compliance of the will and the codicil with all legal requisites.

Minnie Mayhew's husband died in August of 1944, and, about three months later, she underwent major surgery. As a consequence she was hospitalized for some time and it appeared, when she was later removed to her home, that she would be bedfast for the rest of her life. Her sons, Dale and Denver, believing one of them should be near her, agreed that Denver and his family should move from their farm to the home of Minnie Mayhew. The latter resided on the home farm. This had been devised to her by her husband's will for her life, with remainder to the two sons. Denver and Zula, his wife, were to care for Minnie Mayhew and Denver was to manage the farm and receive the profits therefrom.

After returning from the hospital, Minnie Mayhew slowly regained her health and was able to move about and care for herself to some extent. Denver and his family remained in the house of Minnie Mayhew for about a year. When they left, Dale contracted with his mother in writing to run the home farm, agreeing to give her one-fifth of the profits derived from it. Dale did not move in with his mother but hired a series of tenants and their wives to till the land and to live with her and attend to her wants and needs. She paid these tenants for her board and for doing her laundry. The contractual arrangements between Dale and his mother remained in force until she died on March 8, 1957 at the age of 83.

During the year prior to the execution of the codicil, Minnie Mayhew suffered a

short illness. Then in August of 1956, she became bedfast and an invalid and continued in such a state until she passed away. During the last eight months of her life, Dale and Mary Dee spent every night with her and also remained in her company part of each day. The evidence discloses that Denver came to see his mother frequently during her last illness, but infrequently before that time, while Dale and Mary Dee were constant visitors at all times. They took her to town when she desired to go, and accompanied her on the trips she made when she went to her attorney to prepare the will and the codicil. They were not present on the occasions that both these instruments were executed, and they claim they did not know about them, although both of them were tentatively sketched out at Minnie Mayhew's home and were brought to the attorney only for the formalities of copying, signing and witnessing.

Minnie Mayhew's attending physician, Doctor Carter Moore, testified she received excellent nursing at home during her last sickness and that then, as in the years before she became an invalid, Dale and Mary Dee often called upon him personally to consult about her condition. Many witnesses, including Doctor Moore, testified that until her fatal illness, Minnie Mayhew had a strong mind and was capable of managing her affairs. Willie Gregory, who at one time looked after Minnie Mayhew during the time her husband worked on the home farm as a tenant, described her as a person with a "mind of her own up until her last sickness."

Appellant calls our attention to certain incidents brought out by the evidence which are emphasized by him as constituting "glaring examples" of the domination of Minnie Mayhew by appellees, or one or the other of them. The first of these relates to a difficulty that ensued between Dale and Denver on the home farm on February 25, 1954, and it is claimed Dale compelled his mother to proceed against Denver by warrant and later testify in his, Dale's, behalf when the charge preferred by her against Denver was tried. Two acts of alleged mistreatment of Minnie Mayhew by Dale and Mary Dee were brought out by the testimony of two tenants who lived on the home farm during the years 1954 and 1955. It is maintained these acts of misconduct point up the overpowering authority Dale and Mary Dee had over Minnie Mayhew. However, for reasons that will be set forth hereinafter, we shall do nothing more than mention these occurrences.

■ It is finally contended undue influence is to be inferred from certain expressions used by Minnie Mayhew in the last days of her illness. Denver testified at some length to statements made by his mother that would tend to indicate she executed the will and codicil in question because she was coerced to do so by Dale. Plainly this character of evidence was inadmissible under the provisions of KRS 421.210(2), but the record does not show any objection was interposed to its introduction. Nevertheless, Denver's testimony along this line is so obviously self-serving that it has little, if any, value as substantive proof.

In the memorandum opinion delivered at the time appellees' motion for judgment notwithstanding the verdict was sustained, the lower court ruled there was no competent evidence of probative worth which showed the actual exercise of undue influence upon the testatrix at the time the will and the codicil were executed.

■ There are many decisions in Kentucky involving the question of undue influence. The one basic principle governing the disposition of every case where undue influence is claimed to have been employed, the rule that must be kept in the forefront in weighing the facts presented in such a case, is that the power or force imposed must be of such a nature as to destroy the free agency of the maker of the will. See v. See, Ky., 293 S.W.2d 225.

This Court in Berryman v. Sidwell, 278 Ky. 713, 129 S.W.2d 154, pointed out that the rules by which courts or juries may ascertain the existence of a mental power or force so subtle and intangible as that denominated as "undue influence" are perhaps not definable, and that no general guide may be laid down by which this mental power or force may be detected.

■ The courts are agreed, however, that acts which constitute undue influence sufficient to vitiate a will must come into play *at or prior to the time* of the execution of the testamentary instrument. In respect to the time factor, 94 C.J.S. Wills § 224, pp. 1071–1072, makes this statement: "It is not necessary that the acts of undue influence be exercised or exerted at the exact time of the making of the will, and the person exercising such influence need not have been present at the time of the making thereof; but it must be shown that such influence, whether exerted at the time of the making of the will or prior thereto, was operative *at the time of its execution,* and was directly connected therewith." See Copley v. Craft, Ky., 312 S.W.2d 899; Madden v. Cornett, 290 Ky. 268, 160 S.W.2d 607; and Ecken's Ex'x v. Abbey, 283 Ky. 449, 141 S.W.2d 863.

■ We believe, as undoubtedly the trial judge believed, that the incidents claimed by appellant to reveal that Minnie Mayhew was dominated by Dale and Mary Dee, his wife, assuming she was not a free agent under the circumstances, were too far removed from the date the will was executed to merit consideration. It will be recalled that the will was made on March 2, 1949, and the act of so-called undue influence exerted closest to this date transpired in the early part of 1954, or almost five years later. Since all of the incidents relied upon to prove coercion happened long after Minnie Mayhew made her will, under the rule of law governing, we cannot assume undue influence was operative at the time of its execution. Indeed, all but two of these incidents occurred before the codicil came into existence, and, even if it were declared void, appellant would not be entitled to the overall relief he seeks in this litigation. Nor may we surmise or conjecture that these occurrences of alleged domination disclose a pattern of behavior as to any authority brought to bear upon Minnie Mayhew by Dale and Mary Dee that may be regarded as retrospectively affecting the type of will and codicil that came into existence.

■ It is our view the lower court correctly determined that the evidence put forward to support the contention of undue influence in this case was insufficient.

Wherefore, the judgment is affirmed.