## Jefferson Dry Goods Co. v. Blunk.

(Decided May 5, 1936.)

CHARLES W. MORRIS for appellant.

LEIBSON & LEIBSON for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellee brought this suit in the Jefferson circuit court to recover of the appellant, Jefferson Dry Goods Company, a corporation, for personal injuries received by her while in appellant's store.

By the petition and petition as amended, appellee, plaintiff below, alleged that defendant had certain tables or counters in its store for the display of its merchandise; that on the 2d day of June, 1934, while she was in defendant's store as a customer, she was walking down the aisle of the store and that her left buttock came in contact with one of the tables or counters in defendant's store, and a splinter of wood on the edge or side of a table penetrated her flesh, severely injuring her, and as a result of such injury she was caused to and did suffer and will continue to suffer great physical pain and mental anguish; that the injury was caused by the defective, dangerous, and unsafe conditions of the table or counter in defendant's store, which condition was known to the defendant and its agent in charge of the store, or could have been known by them by the exercise of ordinary care, and which condition was unknown to her prior to the time she was injured; and that her injury was caused by the carelessness and negligence on the part of the defendant in that it had permitted its said tables or counters to become defective, dangerous, and unsafe. She prayed to recover the sum of $5,000 for personal injury, and the sum of $100 for doctor bills for the treatment of her injuries.

Defendant's answer consisted of a traverse and a plea of contributory negligence. Upon the trial of the case the jury returned a verdict for appellee, plaintiff below, in the sum of $750 plus $75 for her doctor bills. Motion and grounds for a new trial were filed and overruled, and judgment was entered on the verdict. Hence this appeal.

Numerous alleged errors are set out in the motion and grounds for a new trial, but in brief of appellant the following only are insisted on: (1) The verdict is

contrary to law and not supported by the evidence; (2) the court erred in refusing defendant's motion for a peremptory instruction at the close of plaintiff's evidence and at the close of all the evidence; (3) misconduct on the part of plaintiff's counsel; (4) misconduct on the part of a juror; and (5) the verdict is so excessive as to indicate passion and prejudice on the part of the jury.

We will discuss the points in order named.

Points 1 and 2 both relate to the evidence and we will discuss them together.

Appellee testified that about 3 o'clock on the afternoon of June 2, 1934, she, with her fourteen year old daughter, Ruth Blunk, went to appellee's store to do some shopping. They entered the basement department of the store and were looking over the merchandise which was placed on various tables or counters to find a piece of goods to make a dress. She described the accident resulting in her injury in the following language:

"Q. Mrs. Blunk, tell the jury in your own way exactly what happened? A. Well, I went through from the Fourth Street entrance and went back to the basement and went down the steps and turned to my left and went up the aisle, with my daughter walking on this side of me (indicating), and I went to speak to her, and in doing so I turned to my right, like that, and the splinter jabbed me here in the buttocks, from the counter table running like this.

"Q. Mrs. Blunk, what did you do when that splinter went into you? A. Well, what anyone else would have done—I screamed and grabbed myself, and my daughter said: 'What is the matter?' I said: 'I have run a splinter from this table into my flesh.' I turned and looked at the table to see just what it was, and along in the edge of the table like this, running this way (indicating), there was a place two inches; the first part of it was real dark, like it had been exposed to air and dirt for a week or so, and the rest was real light; and when I grabbed myself that splinter broke, and I knew what was wrong. * * *

"Q. Now, Mrs. Blunk, before you get to that —this two-inch space on that table, that you have told the jury about, and the first part of it that had become discolored from exposure—tell the jury whether the part of the splinter that went into your body was the part that had covered previously that exposed part of that two-inch space? A. Well, the first part of it was the part that went into my body, and that was the dirty part, that had been exposed to dirt and air. * * *

"Q. Did you report this to the Jefferson Dry Goods Company? A. I did. He sent me to the office, to Miss Kaufman. He told me to give her my name and address and she would take care of me. I wanted to go to the rest room to try to try to get the splinter out, but he sent me to Miss Kaufman. * * *"

She further testified that she told Miss Kaufman what happened and Miss Kaufman asked her to give her name and address, which she did, and she asked for the rest room and told Miss Kaufman she wanted some one to take the splinter out, but Miss Kaufman offered her no assistance other than to ask her if she wanted some mercurochrome. She then decided to go home and have the splinter taken out, and during this time she was suffering great pain and agony. When she went home, she called her married daughter, Mrs. Evelyn Lantz, who came to try to help her, and when her daughter looked at the place she advised her to go to the doctor. She went to Dr. Casper and he localized the wound and operated on her, and picked out as much of the splinter as he could, but could not get it all because the place bled so badly. The doctor also gave her tetanus shots, which she said made her very nervous and sick. Infection and an abscess developed and on the advice of the doctor she applied hot applications or poultices to it, but it continued very painful for several weeks, and she was in so much pain that she could not sleep and the doctor gave her medicine to make her sleep. She said that the doctor treated her every day for three weeks and then every other day for a while. The inflammation subsided and then the place reabscessed and then after some improvement it abscessed the third time. She said that during all this time she

suffered terrible pain in her hip and limb and could not put it to the floor and it caused her to have headaches; that the wound swelled and pus formed in it and had to be drawn occasionally which was very painful to her. She further testified that she could not walk for about four and a half weeks, and it continued to give her pain and trouble occasionally up to the time of the trial, which was May 21, 1935, approximately one year after the accident; that when sitting for any length of time her hip would become numb and pained her.

The plaintiff's daughter Ruth, who was with her at the time of the accident, and also her daughter Mrs. Lantz, who rendered her first assistance and helped nurse and look after her, were introduced as witnesses for plaintiff and their testimony strongly corroborated the plaintiff. The testimony of the daughter Ruth in regard to the condition of the table and the manner in which the accident occurred was the same as that of the plaintiff, and also that the man who said he was supposed to be the manager of the store examined the table and saw the condition as described by her and her mother and the only remark that he made was, "What do you think of that?" Mrs. Lantz' testimony with reference to the nature of the wound and the treatment of it was subtantially the same as that of the plaintiff.

Dr. Casper was introduced in behalf of plaintiff and testified as follows:

"Q. Doctor, did you treat this lady, Mrs. Blunk? A. Yes sir.

"Q. Will you please tell the jury what you treated her for? A. She ran a splinter in her left hip, into the gluteus maxims muscle—that is, the large muscle of the hip.

"Q. Will you just point on your body where that was, Doctor? A. Right here. (Indicating.)

"Q. Tell the jury what you found there when you first saw her? A. I found a puncture wound, where evidence of a splinter—

"Q. Describe that to these gentlemen? A. A puncture wound would be an opening like you would run a nail or anything else in it to tear the skin.

"Q. What did you do on the first occasion you saw Mrs. Blunk? A. I injected novocaine around that opening and made an incision down, cut what I thought was the splinter, and got part of the splinter out of it.

"Q. Did you have to go very deep into her flesh, Doctor? A. Went down to that muscle; I guess an inch or deeper.

"Q. I want you to describe to this jury just exactly what you did in that operation? A. Well, I injected it with novocaine, and made an incision— cut down following the course of that splinter, and cut a little splinter out—got a little particle of splinter out.

"Q. After you performed that operation what did you do? A. Well, I gave her a lockjaw serum, and of course I put a sterile dressing on there.

"Q. Why did you think it was necessary to give her that lockjaw serum? A. Well, puncture wounds oftentimes become infected, and they are dangerous, and we usually always give lockjaw serum with puncture wounds."

Dr. Casper further testified that plaintiff seemed to be in much pain; that he treated her every day for three weeks and the place became infected which necessarily required more treatment. He said he frequently opened the wound to drain the abscess, which was very painful, and he prescribed sedatives for her for two or three weeks. He said that after he had quit treating her regularly she called him occasionally and complained of pain in her hip. He gave it as his opinion that there is either a particle of splinter or foreign body in her hip, or there was scar tissue. He said that the pain might continue for some time, or it might clear up.

Certain employees of appellant's store were introduced as its witnesses, who testified with reference to the condition of the tables in the store. However, Mr. Beatty, who was manager of the store at the time plaintiff received her injury, had resigned his position some time previous to the trial and was not introduced as a witness. It is claimed that he could not be located. Other employees of the store testified that they ex-

amined the tables or counters and found dent places in the wood and the paint was off in places, but they found no splinters or other conditions described by the plaintiff and her daughter who was with her at the time she was injured. In this respect there is a conflict in the evidence, which was a question for the jury. In view of the evidence produced for the plaintiff, we are unauthorized to say that it was insufficient to take the case to the jury or that the verdict is flagrantly against the evidence. There is no merit in appellant's contention that it was entitled to a directed verdict in its favor.

(3) The misconduct of plaintiff's counsel complained of is that in the course of his argument to the jury he made some reference to the fact that plaintiff was a widow and the defendant was a big corporation. However, the alleged remarks of counsel do not appear in the bill of exceptions or other place in the record, other than in the affidavit of counsel. It is the well-known rule that things occurring during the trial must appear in the bill of exceptions and show that objections and exceptions were properly taken. This rule is too well known to require citation of authority. However, see Engleman v. Caldwell and Jones, 243 Ky. 23, 47 S. W. (2d) 971, and Rouse v. Rouse, 243 Ky. 447, 48 S. W. (2d) 1049.

(4) The alleged misconduct on the part of a juror is that after the jury was impaneled and accepted and during the noon recess, one of the jurors went to the store where plaintiff claims she was injured and examined some tables. Certain employees of the store testified that the juror entered the store and examined the tables on the north side of the room, but it appears that the table from which plaintiff received her injury was on the south side of the room. There is no evidence tending to show that the juror examined all the tables or the particular one in question. This occurred on May 21, and before the evidence had been introduced. This information was not imparted to counsel for appellant until on the morning of May 22, at which time counsel for appellant, with the permission of the court, interrogated the juror and he admitted that during the noon recess on the day previous he visited the basement of appellant company's store and made an exam-

ination of the tables. But the record does not disclose that counsel for appellant made any objections thereto or moved the court to discharge the jury on that ground and proceeded with the trial without objections thereto until after the verdict had been awarded and the jury discharged, although he had this information before plaintiff had closed her case. In Consolidated Ice-Machine Co. v. Trenton Hygeian Ice Co. (C. C.) 57 F. 898, where a similar question was involved, it was held that the complaining party waived the misconduct of the juror by not calling the court's attention to the fact until after the verdict was returned, although the misconduct of the juror was known to the complaining party before the testimony was closed. In the present case the attention of the court was called to the fact that the juror had made the inspection of the premises in question, and the juror was examined in open court in reference thereto. But it was not incumbent upon the court upon its own motion to discharge the jury or take any action in reference thereto unless requested to do so by appellant. Under these circumstances, we think appellant waived the question.

It is the established rule that a party litigant who takes his chance on matters within his knowledge and without objections will not be heard to complain of such matters after the case has been determined adversely to him.

It appears that after the trial and the rendition of the verdict appellee, plaintiff below, filed a substitute petition. It is urged, as additional grounds of reversal of the judgment, that the substituted petition did not allege that the dangerous and unsafe condition of the tables in appellant's store were known to the defendant or could have been known by it by the exercise of ordinary care, and, further, that there was no evidence that defendant knew of the alleged unsafe condition of the table, or could have known of same by the exercise of ordinary care. It was alleged, however, in the substituted petition,

"that through the carelessness and negligence upon the part of the defendant, its agents, servants and employees the defendant had caused and permitted said tables or counters to become defective, dangerous and unsafe."

The substituted petition was not demurred to or other question raised in reference thereto.

Appellee and her daughter Ruth described the splinters on the table where she received her injury as being dark and dirty, which indicated, of course, that they had been loose and projecting from the table for considerable time. The witnesses said that the splinters looked like they had been exposed to air and dust for a week or more, which was a conclusion of the witness, but the court admonished the jury not to consider that part of their testimony with reference to the time the witness thought the splinters had been loose. But the description of the splinters was competent evidence and the jury may have believed from the description given that the splinters had been loose and projecting from the table a considerable length of time, or at least a sufficient time to give the appellant's employees time to observe same by the use of ordinary care.

In the case of Chesapeake & N. Ry Co. v. Venable, 111 Ky. 41, 63 S. W. 35, 23 Ky. Law Rep. 427, wherein a similar question was presented, we said:

> "The failure of the petition to allege that defendant knew, or by the exercise of reasonable care could have known, of the existence of the defect, was cured by a verdict for plaintiff; it being averred that defendant negligently permitted its cross-ties and roadbed to become rotten and defective."

See, also, to the same effect Cincinnati, N. O. & T. P. Ry. Co. v. Barkley, 13 Ky. Law Rep. 331; Owensboro & Henderson Gravel Road Co. v. Coons, 49 S. W. 966, 20 Ky. Law Rep. 1678; City of Louisville v. Snow's Adm'r, 107 Ky. 536, 54 S. W. 860, 861, 21 Ky. Law Rep. 1268.

In City of Louisville v. Brewer s Adm'r, 72 S. W. 9, 24 Ky. Law Rep. 1671, it was said:

> "Any defect in a petition in an action against a city for injuries due to a defective street, in failing to aver that the city had notice of the defect, was cured by a verdict for plaintiff, where it appeared that the instructions distinctly submitted the question of notice to the jury."

In the present case the court instructed the jury in substance that it would find for the defendant unless it believed from the evidence that the unsafe and dangerous condition of the tables in question were known to the defendant, its agents, and employees, or could have been known by the exercise of ordinary care.

Our conclusion is that the evidence and instructions cured the defect complained of in the substitute petition.

(5) Lastly, it is insisted that the verdict is so excessive as to indicate passion and prejudice on the part of the jury. The jury had the right to accept the testimony of the plaintiff and her witnesses, in reference to the extent and nature of appellee's injury, pain and suffering as a result of the injury. It will be noticed from the resume of the undisputed evidence given above that as a result of the injury appellee was confined to her bed and home for several weeks, unable to walk or attend to any business, and, during this time she suffered severe pain. There is some evidence to the effect that she was still suffering more or less pain up to the time of the trial, which was approximately one year after the injury. It is the rule that the power of the court to grant a new trial on the ground that the verdict is excessive should be exercised with great caution and only in extreme cases. Nolan's Adm'r v. Standard Sanitary Mfg. Co., 111 S. W. 290, 33 Ky. Law Rep. 745; Snyder v. Louisville Ry. Co., 150 Ky. 816, 150 S. W. 986. In Louisville & I. Ry. Co. v. Speckman, 169 Ky. 385, 183 S. W. 915, 921, the plaintiff's injuries as described in that opinion were no greater, and indeed probably less severe, than that proven in the present case. He was allowed the sum of $1,100, and in affirming that judgment on an appeal to this court, we said:

"The verdict, in amount reaches the maximum limit, but cannot be declared grossly excessive or glaringly disproportioned to the injuries sustained, and we are not authorized to reverse a judgment on account of excessive damages, in the absence of a showing that the verdict is so grossly excessive as to indicate that it was given under the influence of passion or prejudice."

See, also, Chesapeake & O. R. Co. v. Witte, 169 Ky. 568, 184 S. W. 1128; Louisville Ry. Co. v. O'Connell (Ky) 126 S. W. 1103.

We are impelled to the conclusion that the verdict is not excessive.

Finding no error prejudicial to appellant's substantial rights, the judgment is affirmed.