## Vogt et al. v. Keller.

Feb. 13, 1942.

Burke & Lawton for appellants.

J. Verser Conner for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellee was plaintiff below; appellants were defendants. Appeal is from judgment following a verdict awarding appellee $7,000, subject to a credit paid during the course of litigation, in the case of Com. Life Ins. Co. v. Adam and Lulie W. Vogt, et al.

In order to bring contested points to the forefront it is necessary to state, substantially, the nature of and proceedings in the then pending suit, which was filed in July, 1936, and grew up in the following way: The Vogts jointly owned several parcels of real property in Louisville, among which was the Plaza Hotel. Mr. Vogt had been doing financial business with the Louisville Trust Company for a number of years; in 1927 desiring additional loans he and his then attorney worked out a plan to provide further security.

There was in existence a family corporation, the Citizens Realty Finance Corporation. In July, 1927, the owners conveyed the Plaza to the finance company, which executed five lien notes to Mr. Vogt, due in various periods for $15,000 each; Mr. Vogt pledged them to the Louisville Trust Company on an indebtedness of $65,000.

The finance company later reconveyed the Plaza to the owners jointly. The real consideration being "the assumption by the second parties of the five notes." It was claimed by Mr. Vogt that the "assumption" clause was interpolated by mistake.

In November, 1929, Mr. Vogt executed a note to the insurance company for $66,000, collateral in form, but failing to describe collateral. Mr. Vogt owed the Trust Company a considerable sum, and it was pressing him for a reduction, particularly of the Plaza notes. After Mr. Vogt had obtained the loan the company indorsed its check "for Adam Vogt," and turned it over to the Trust Company. Contemporaneously the Trust Company transferred the Plaza notes to the insurance company.

Thereafter, in 1934, the Vogts and the finance company filed petitions in bankruptcy, Mr. Vogt listing in his schedule the insurance company as a secured creditor, part of his debt being secured by Plaza notes. In bankruptcy proceedings the insurance company filed its claim, and the court upon its motion adjudged that its lien indebtedness, then reduced to $65,000, was secured by the notes, and at a directed sale the Commonwealth purchased them. Later Mr. Vogt moved for a discharge, to which a creditor objected, but after it had been indicated that all of their real property, including Plaza, was mortgaged beyond market values, objections were withdrawn and in December, 1935, bankrupts were discharged.

In March, 1936, the owners reconveyed the Plaza to the finance company, subject to the insurance company's lien. Mr. Vogt had learned that the records of the Trust Company did not show the transfer of the notes, and that the notes to the insurance company failed to describe collateral. In the bankruptcy proceeding the trustee renounced interest in the real estate, estimated to be worth about $200,000, apparently upon the claim of Mrs. Vogt that she had advanced considerable sums for upkeep and improvements, hence entitled to an equitable lien for more than $90,000, resulting in a saving to the owners of all their real estate, with the exception of the Plaza. Appellee was not concerned in the bankruptcy matter.

Following the Commonwealth suit, Mr. Woodbury who had been Mr. Vogt's attorney for more than thirty years, and Mr. Sachs, were employed to defend. One

attorney filed what is referred to as a "formal answer" on August 3, 1936; the other later filed a "detailed answer," signed by both Sachs and Woodbury. In the latter answer the Commonwealth's title to the notes was challenged on the grounds above set out, and it was asserted that the Commonwealth had no claim against the Vogts or lien against the Plaza property. Mr. Woodbury later died and nothing was done until the employment of appellee in November, 1936. Up to the time of employment no answer had been filed by Mrs. Vogt; later the plaintiff filed an amended petition which alleged that Mr. Vogt, during bankruptcy proceedings, had made a new promise to pay.

In the months following appellee's employment the plaintiff filed five amended petitions, and tendered a sixth. The original petition sought judgment against the Vogts and the finance company for $75,000, with semi-annual interest from July 7, 1927. The third amendment set up a later promise of Mr. Vogt. After a year or more the plaintiff apparently concluding it could only recover $65,000 and interest on the vogt note, discontinued its efforts to recover $75,000, but in a third amended petition prayed judgment for the lesser amount, and as originally prayed against Mr. Vogt and the finance company on the Plaza notes.

There was a plea of limitation as to some of the notes. Mrs. Vogt in answer denied liability on the ground that she was not directly bound, but had set aside her interest in the property as surety on Mr. Vogt's obligation. Prior to the institution of the suit the owners had offered to surrender the Plaza to the insurance company in satisfaction of its debt; this offer was declined for the reason, as indicated by its counsel, that it believed it could secure personal judgment for the total debt with interest. It is admitted that the property was not worth the lien debt. The record shows that during litigation it was rented, and when finally sold the Commonwealth, sole bidder, purchased the property.

On April 26, 1939, the chancellor held that Mr. Vogt was personally bound by reason of the assumption of the notes in the Plaza-Finance Company transaction, but that both he and the "dummy" corporation having been adjudged bankrupt were released. That the first promise made by Vogt to pay the indebtedness could not be enforced, because a fraud on the bankruptcy law and

holding failure of proof to sustain the later promise; that Mrs. Vogt was not personally bound on any of the five notes; that while the statute of limitations barred two of the lien notes, the instrument created a lien, hence the 15-year statute applied, and it was upheld, the chancellor declining to give deficiency judgment.

In brief for appellant it is contended that when appellee was employed by Mr. Vogt, he was a young attorney just beginning to practice law in Louisville, and had agreed that if employed he would be reasonable in his charges for services rendered. He had been employed by Mr. Vogt prior to his entry in the insurance company's suit, in making collections. There is no showing that during the more than two and one-half years of litigation complaint was made as to the conduct of the litigation.

There is also a reference to payments of a fee to Mr. Sachs, made for the purpose of comparison of the fee paid him with that claimed by appellee. It may be gathered from the testimony that notwithstanding Mr. Sachs' name was signed to numerous pleadings, he admittedly was rather on the side line, and though frequently consulted to advantage, had no great part in the trial or preparing pleadings. However this may be, or as to matters leading up to the employment, if having any bearing, they were brought to the attention of, and subject alone to the jury's consideration.

In presenting the case to the jury appellee had prepared a hypothetical question, which covered some fifty or more pages. Copies had been furnished to ten members of the Louisville bar, each being, as we view the list, of unquestioned standing and high reputation, as were also the attorneys testifying for appellants. This question set out in minute detail the procedure in the insurance company's suit, and summarized the issues and beneficial results claimed to have been obtained.

We have undertaken to give the basis and purpose of the suit in a fair and substantial manner, and it would unnecessarily prolong this opinion if we undertook to do more than summarize the question, which in addition to being furnished to appellee's witnesses, was read to the jury.

In his summary appellee, perhaps, split his issues. He set out some twenty-five or more paragraphs with

sub-heads, in some instances termed issues. It is clear from a reading of the pleadings that there were not really that many issues. It is apparent that it was intended to manifest the questions of law involved in the respective issues, as well as the time expended in working out the law relative to the issues; but when we look over the list of attorneys who testified for appellee, we cannot conceive for a moment that any one of them was confused as to the issues. There was no question as to their qualifications, since they were by study and experience qualified to give the jury assistance in solving a problem which a jury is not able or expected to solve, because, in cases of this sort, lacking adequate knowledge on the subject.

Without going into detail as to results, the summary (and appellee's testimony) shows the number of days engaged in taking depositions; days in court, and time expended in consultation, etc. There were 52 pages of pleading by plaintiff; 78 by defendants; a great number of exhibits. There were listed 800 telephone calls by Mr. Vogt, whose secretary estimated the number from office at 200. Appellee may have over-estimated the number, though it might have been that some of these calls were not with the knowledge of the secretary. However this may be, the jury had the right to determine this factual issue. There were 100 calls to Mr. Vogt; 125 conferences with him, and 150 separate written communications, and numerous conferences with persons other than Mr. Vogt, and Mr. Vogt supplied appellee with many pages of material, which he no doubt thought pertinent to the defense.

Appellee testified to, and the hypothetical question contained a statement of "estimated savings." Appellee treats, and it seems properly so, the suit as seeking recovery of $75,000, being the amount of the original notes, which it appears the insurance company was claiming to hold, not as collateral but as owners by reason of the assignment. The interest on these notes amounted to approximately $54,000, appellee thus estimating the saving to the Vogts of $129,000. Appellee conceived also that being relieved of personal liability, the owners emerged with a loss of no more than what they had offered to creditors before suit.

In addition the Vogts, according to appellee's estimate, received three years' rentals from the Plaza, to

the amount of $18,000, and effected a saving in taxes. Deducted from the total was Mr. Vogt's appraisal of the Plaza at $25,000, which, however, sold to the only bidder (insurance company) for a greater sum, for reasons above stated.

The sum total of the estimate of "saving" was fixed by appellee at $138,000. It may be that "saving" was overestimated, but as we view the whole case, and read the proof of some of the witnesses for plaintiff, who themselves estimated the "savings" at a considerable less figure, the estimate by appellee did not serve to prejudice the rights of appellants. We say this because, as will be later shown, these matters of "issues" and "savings" were discussed before the jury while appellee was testifying, and particularly during his cross-examination. Mr. Vogt testified at length, as did Mrs. Vogt, and we fail to find that either went, or were asked to go into the matter of the amount saved as a result of appellee's conduct of the defense. A brother of Mr. Vogt's did testify as to rentals of the Plaza property, and made the total less than as estimated by appellee, who says he was relying upon information received from the owner. This brother also testified on other matters of values, as did another witness, which might have been reflected in "savings," but not to any great length.

So, it occurs to us that even though we conceive over-estimate by appellee, this was involved in a question of fact which was presented to the jury for determination. There was no decided objection to testimony of appellee on these particular points.

On the question of reasonableness of the fee, as indicated above, there were ten qualified witnesses for appellee. These witnesses based their estimate of a reasonable fee on the question submitted to them before trial. Without undertaking to give the respective estimates, the minimum was $6,000 and the maximum $10,000, nine of the ten fixing the minimum at $7,500. Three equally qualified witnesses fixed their estimate at from one to two thousand dollars, basing their estimates on an inspection of the record; one however having been associated with appellee, though not appearing as an attorney of record.

There is no disagreement as to elements customarily recognized as bearing on the value of an attorney's compensation for legal services. They are fairly

set out in Axton v. Vance, 207 Ky. 280, 269 S. W. 534, and more recently in Baxter v. Hubbard, 242 Ky. 751, 47 S. W. (2d) 743, 746, in which they are summarized as follows: Ability, professional standing, reputation of the claimant, extent of services, labor and time necessarily expended in preparation and trial of the case, value of property involved, nature and importance of the litigation, responsibility imposed, results obtained and standard of fees at the local bar. Lack of ability is not charged, except in an indirect way.

The fact that appellee was not asked to step down is an inference that his employers manifested a belief in fidelity, worthiness of confidence, and it may be added skill, notwithstanding in some respects Mr. Vogt was insistent that his notion of defenses was correct. However, all these matters were presented to the jury, and the fact that capable members of the local bar appeared and testified for appellee would lead us to conclude that as to personal attributes appellee met qualifications, and there is nothing in the testimony of those who testified for appellants to indicate lack of these attributes, except that it may be inferred there was lack of ability, because in defense certain issues were unnecessarily raised. On this there was disagreement, particularly on the part of able adverse counsel, and who might have adopted the language of opposing counsel in the Baxter case: ''I have tried a number of cases but this was one of the most bitterly fought cases I have ever been in.''

It is argued that the record in the insurance case, a greater part of which was filed, though not shown to have been read to jury, is the best evidence, and the Baxter case is cited in authority. In that case we held that ''evidence of attorneys as to the reasonableness of fees will not be accepted as conclusive and that the court would exercise his prerogative of fixing such fees as in its judgment seemed proper. * * * such evidence is not conclusive on the jury.'' The first part of the quotation is taken from Erdman's Adm'r v. Erdman's Adm'r, 231 Ky. 219, 21 S. W. (2d) 258, which we note was a hearing on the reasonableness of a fee before the chancellor, who had tried the case in which the services had been rendered.

The second is from Morehead's Trustee v. Anderson, 125 Ky. 77, 100 S. W. 340, 342, a jury case, and we held that a hypothetical question was competent, since

"what is a fair and reasonable compensation for professional services is largely a matter of expert knowledge * * * [though such] is not conclusive on the jury." Reference is also made by appellants to Stucky v. Smith, 148 Ky. 401, 146 S. W. 1128, as being conclusive on the question. We do not find it so, since in that case, as is manifested, we were giving effect to Subsection 4 of Section 38 of the Civil Code of Practice relating to allowance to guardian ad litem, which provided that extrinsic proof was allowable to prove services rendered, but not to prove value.

The distinction in the classes of cases is pointed out in Roederer v. Schmitt, 258 Ky. 398, 80 S. W. (2d) 35:

"This is not a case where in a pending action counsel was entitled to a reasonable fee to be allowed by the court, and asked the court to make such an allowance. In that character of cases the court is not controlled by the evidence alone, but may exercise its own judgment. . Here we have a common-law action * * * in that character of action the question is for the jury, and the court will not set aside its finding where it is sustained by the evidence."

While this does not admeasure the weight to be given to one character of evidence or the other, in the case at hand an opinion gathered from a survey of the record, was not in all respects the best evidence on the whole case, for the simple reason that the record did not on its face show many of the elements for which appellee was entitled to remuneration, and witnesses testifying for appellants based their estimates alone upon reading the pleadings, including depositions in the insurance case; in other words, "the questions presented by the record," and conferences with appellee.

The argument that a verdict should be set aside "where the physical facts (the record) are at variance with statements of plaintiff and his witnesses," has no application here. Cases where we have applied the rule, Louisville & N. R. R. Co. v. Johnson, 168 Ky. 351, 182 S. W. 214, L. R. A. 1916D, 514, citing other cases, deal with a situation where the evidence produced or relied on are impossible or at absolute variance, when measured by established physical laws.

It is not necessary for us to consider or decide on the contention of appellee that the evidence given by appel-

lants' expert witnesses was incompetent, but when we come to consider the argument that it was the best evidence, in the sense the word "best" is used in legal parlance, any doubt would have to be resolved contrary to the argument, as is evidenced by reference to Axton v. Vance, supra.

In brief of appellant it is stated:

"Over objection of defendants plaintiff propounded a hypothetical question of 59 pages, purporting to give the testimony of the plaintiff to a number of lawyers."

We might dismiss the argument that the question was "incompetent and misleading," by suggesting that we fail to find objection to the question as a whole. We do find that while appellee was testifying, in detail, reciting every fact assumed in the hypothetical question, there were interposed objections to some eight or more questions, which we upon examination conclude the court properly overruled. It is suggested that the question as framed, was highly prejudicial "misleading in several particulars, and deceiving the witnesses as a whole."

As we read the proof, the witnesses were put through rather strict cross-examinations, and we fail to find that there is ground for concluding that they, or any of them, were mislead or deceived, nor could the jury have been, since the appellee testified at such length as to require several hundred pages in transcription, all in line with the hypothetical question. It would take several pages to respond to the 28 detailed specific objections to various portions of the propounded question. The sum and substance of the argument is that it failed to comply with well established rules.

"The hypothetical question grouping therein the facts forming the premises upon which the answer of the witnesses must be based must include no facts not shown by some of the testimony to have existed; nor must it omit any relative fact shown by some of the testimony to have existed." Axton case supra [207 Ky. 280, 269 S. W. 536].

We have carefully examined not only the hypothetical question, but the 28 objections and each and every one goes only to the question of truth of appellee's statements on examination and as contained in the question. The fact that there was conflicting testimony does not

make the question incompetent, if the question was based on any state of facts. Stewart v. Douglas, 235 Ky. 121, 129, 29 S. W. (2d) 637. Nor was it requisite to the competency that counsel in preparing the question, anticipate facts that were or might have been later developed by defendants, who had the opportunity and whose duty it was to cross-examine and submit additional facts if it was desired to bring such to the consideration of the jury. Stewart case, supra. See, also, Gatliff Coal Co. v. Hill's Adm'r, 263 Ky. 309, 92 S. W. (2d) 56.

It is next complained that the court erroneously instructed the jury. The trial court after preliminaries, advising the jury to be guided by the evidence, and fixing the limits of recovery, laid down the "points" or elements to be considered in fixing the fee. Among them, that the jury should consider the responsibility of and time spent by appellee; "labor expended in the prosecution of his employment, and the value to Keller of the services rendered by him under that employment." It is argued that it was error to base recovery on the "value to Keller of the services rendered," and it may be admitted that the court should not have used the phrase, though the word "services" might be construed to mean the value of the time, effort and labor expended by appellee.

It is also contended that the first part of the instruction which told the jury it should award "such sum as it may believe from the evidence fairly represents the reasonable value in this community of the 'services rendered'" should have read for "reasonable services rendered." Again that there should have been inserted after the word "labor" as used in the instruction first quoted, the words "reasonably required."

We cannot justify ourselves in concluding that the jury was in the least mislead by the interpolation or omission of the words or phrases criticized. Following the instruction quoted, the jury were told that they should measure their finding "by the results accomplished, and the value of the services to Adam and Lulie Vogt," rendered by Keller. Both parties tendered instructions marked "refused" by the court, who prepared and gave his instructions.

Appellant's instructions, in one item, advised the jury to consider "the value of services to Mr. and Mrs.

Vogt," and the amount of time and skill devoted by him to the case, with no use of the words "reasonable" or "reasonably required" in either case. We shall not take the time to discuss whether or not, as claimed by appellee, the alleged errors were or were not invited. Collins' Adm'r v. C. & O. R. Co., 276 Ky. 659, 124 S. W. (2d) 1039, though it is patent that appellants did not offer an instruction embodying the ideas expressed in criticism.

We think the instructions given fairly advised the jury, and the jury no doubt comprehended what elements were to be considered in reaching a proper verdict, since in the first part of the instruction the jury were correctly told they should award appellee such sum as from the evidence they believed "fairly represents the reasonable value in this community of the services rendered by Keller to his clients."

Finally it is complained that counsel for appellee in his argument to the jury stepped beyond proper bounds in suggesting that the jury award the full amount sought, and let the parties take care of any question of compromise after the verdict. We find that while one of the grounds in support of a new trial was "misconduct of the jury and the prevailing party and his attorney," there is no showing of misconduct of the jury or of alleged misconduct of attorney; nor do we find any reference to alleged misconduct set out in the bill of exceptions, hence nothing showing that objection was made at the time of the alleged statement, with ruling, or opportunity for the court to rule. In this state of the record we cannot say that there was prejudicial error. Jefferson Dry Goods Co. v. Blunk, 264 Ky. 673, 95 S. W. (2d) 244; Davis v. Graves, 250 Ky. 654, 63 S. W. (2d) 803.

However this may be, we find nothing in the attributed language which would bias or prejudice the jury, or calculated to influence the verdict one way or the other. Lawyers may and do frequently disagree as to the reasonableness of a fee charged for legal services. This court, as may be seen by reference to numerous opinions, frequently disagree with the chancellor or a jury in fixing such compensation. Here a jury composed of laymen, after hearing much evidence fairly presented, has determined what was a reasonable compensation, and even though we might disagree "when the fee is fixed by a jury, the judgment is to be measured by the general

rule pertaining to verdicts being palpably against the evidence. That rule would have to be stretched beyond the breaking point were we to endeavor to make an affirmative application here.'' Baxter case, supra.

Finding no prejudicial error appearing in the record, the judgment is affirmed.